# Richmond.

## BERTA E. WILLIAMS v. FIDELITY LOAN AND SAVINGS COMPANY, AND OTHERS.

March 19, 1925.

Absent, West, J.

Argued before Judge Kelly took his seat.

1. APPEAL AND ERROR—*Cross Bill by Appellant Under Rule VIII of the Supreme Court—Suits Heard Together—Dismissal—Case at Bar.*—In the instant case a stockholder filed a bill against a Fidelity Loan and Savings Company and its directors and officers. The Fidelity Company filed its bill against its officers and directors. The prayer of both bills was that defendants be held liable for losses sustained by the Fidelity Company, by reason of the negligent manner in which its affairs had been conducted by the defendants. The court ordered that as the cases involved similar questions, the two causes should be heard together. Upon hearing both bills were dismissed and the stockholder perfected an appeal. The Fidelity Company did not appeal from the decree dismissing its bill but relied on Rule VIII of the Supreme Court of Appeals as permitting it to assign cross-error in the stockholder's suit.

   *Held:* That no cross-error could be assigned by the Fidelity Company as to the action of the court in dismissing the stockholder's suit, for the reason that the court dismissed the same upon the prayer of the Fidelity Company; and that Rule VIII was not applicable. The Fidelity Company did not confess error as to the decree in the stockholder's suit, but sought to hold the defendants to its bill liable on an appeal (not its own), and when some of the parties defendant to its bill were not parties defendant to the bill of the stockholder.

2. APPEAL AND ERROR—*Consolidation of Actions—Order that Cases be Heard Together—Case at Bar.*—In the instant case a bill was filed against a Fidelity Loan and Savings Company and its officers, and at the same rules the Fidelity Company filed a bill against its officers. The prayer of both bills was that the defendants be held liable for losses sustained by the Fidelity Company, by reason of the negligent manner in which its affairs had been conducted by the defendants. As the two causes involved similar questions, the court or-

dered that they should be heard together. Upon hearing both bills were dismissed. It was contended by the Fidelity Company that as the causes were ordered to be heard together, the suits were consolidated, and therefore but one appeal was necessary in order for the Supreme Court of Appeals to dispose of all the questions involved in the two suits.

*Held:* That the mere fact that the chancellor decreed that the two chancery causes should be heard together, without specifically decreeing that the same should be consolidated, was not sufficient to cause them to be considered as consolidated causes.

3. CONSOLIDATION OF ACTIONS—*Equity—Effect of Consolidation.*—Where several causes are technically consolidated, they become in effect a single suit, at least in so far as the circumstances of the several causes permit complete unity. The evidence in one becomes evidence in the other (subject of course to the control of the court to prevent injustice); the parties to one become parties to the other; and the cause proceeds for all purposes as if the several causes had been originally asserted in a single bill. It must be observed, however, that it is the proceedings that are consolidated and not the claims asserted, save where the latter belonged to the same plaintiff.

4. CONSOLIDATION OF ACTIONS—*Equity—Order that Suits be Heard Together.*—On the other hand, where there is a mere order of hearing together, unmodified, the suits remain as several as before, the only effect being that for convenience and economy the several steps toward the final disposition of the several causes are taken at the same time, and usually in the same decree. The parties to one are not necessarily parties to the other, and the evidence in one is not necessarily evidence in the other.

5. CONSOLIDATION OF ACTIONS—*Equity—Quaere, whether Equitable Causes can be Consolidated—Consolidation and Hearing Together Distinguished.*—The consolidation of several causes is a very different thing from hearing them together. It is sometimes convenient, economical and appropriate that two or more chancery causes should be heard together, but it has been seriously doubted whether any two chancery causes are so identical that they may be consolidated.

6. CORPORATIONS—*Stockholder's Suit—Misconduct of Officer—Case at Bar.*— A stockholder filed her bill against a Fidelity Loan and Savings Company and its officers and directors alleging losses through the misconduct and negligence of the officers and directors in making loans, and that a member of the executive committee was guilty of improper conduct in securing loans reaping large compensation from the borrowers.

*Held:* That the evidence did not support the allegations of the bill as to the member of the executive committee, who so far from being benefited personally, was used by the Fidelity Company for its benefit. The substance of the transactions being that the member of

the executive committee, when the Fidelity Company was without funds, was asked to give his own check, receiving in exchange the check or voucher of the Fidelity Company, which after holding for a brief period he cashed.   This practice of exchange of checks was used without compensation or other benefit to the member of the executive committee.

7.  CORPORATIONS—*Officers and Agents—Fidelity Loan and Savings Company—Negligence of Officer in Passing on Loan.*—In a stockholder's suit against a Fidelity Loan and Savings Company and its officers and directors, the officers and directors were charged with negligence in making certain loans.   The bill of complaint made no allegation of fraud, corruption or profit as to any of the defendants save one, and the charge as to that one was not supported by the evidence. The officers and directors were men of the highest character and stockholders in the Fidelity Company.   The plan under which the loans were made proved an ignominious failure.   In no event would a court of equity have approved of the loans made.   In a sense, however, the loans made were personal, in that the money parted with was not the money of depositors, as is ordinarily the case in matters of this kind, but the money of stockholders.   That the officers and directors erred in judgment was apparent; but such error of judgment was all that could be charged against them.

   *Held:*   That the officers and directors were not liable.

8.  BANKS AND BANKING—*Fidelity Loan and Savings Company not a Bank— Case at Bar.*—In the instant case, a stockholder's suit against a Fidelity Loan and Savings Company and its officers and directors for losses through negligent loans made by the Fidelity Company, it was charged that defendants violated section 4115 of the Code of 1919, which provides that not more than twenty-five per cent of the capital and surplus shall be loaned to one person.   This section is found in the Code under the head of "banks of discount and deposit." The record disclosed that the Fidelity Loan and Savings Company, organized under what is known as the "Morris Plan," was in no sense a receiver of deposits.   No certificates of deposits were issued, no savings accounts were accepted, no examination of its affairs was made by the State examiner of banks, and it was not under the supervision of the State Corporation Commission.

   *Held:*   That the Fidelity Company was not a banking institution, and, therefore, there was no merit in this contention.

9.  BANKS AND BANKING—*Fidelity Loan and Savings Company—Officers and Agents of Private Corporations—Care Required of Officer or Director of a Bank or Loan Institution.*—Directors must exercise ordinary care and prudence in the administration of the affairs of a bank or loan institution, and that degree of ordinary care depends upon the facts and circumstances of the particular case.   They are liable for losses resulting from mismanagement of the affairs and business of a bank

or loan institution. They are not merely bound to be honest, they must also be diligent and careful in performing the duties they have undertaken. But for excusable mistakes concerning the law, and for errors of judgment when acting in good faith, they are not liable.

10. Banks and Banking—*Fidelity Loan and Savings Company—Officers and Agents of Private Corporations—Whether Officer or Director of a Bank or Loan Institution is an Agent or a Trustee.*—The relationship between a bank or a loan institution and its officers and directors is rather that of principal and agent than that of trustee and *cestui que trust.*

Appeal from a decree of the Chancery Court of the city of Richmond. Decree for defendants. Complainant appeals.

*Affirmed.*

The opinion states the case.

*A. W. Patterson,* for the appellant.

*McGuire, Riely & Eggleston, Parrish, Butcher, Churchman & Coulbourn, Christian & Christian, Meredith & Meredith, Pollard & Smith, Geo. Bryan,* and *Samuel H. Gellman,* for the appellees.

Campbell, J., delivered the opinion of the court.

[1] Before entering upon a discussion of the issues involved in this litigation, it becomes necessary to pass upon the status of the Fidelity Loan and Savings Company, Incorporated, which claims to occupy the dual position of appellant and appellee, pursuant to Rule VIII of this court, which is as follows:

"In any appeal, writ of error or supersedeas, if error is perceived against any appellee or defendant, the court will consider the whole record as before them, and will reverse the proceedings, either in whole or in part, in the same manner as they would do were the appellee or defendant to bring the same before them,

either by appeal, writ of error, or *supersedeas*, unless such error be waived by the appellee or defendant, which waiver shall be considered a release of all errors as to him.''

In June, 1921, Berta N. Williams, a stockholder thereof, filed her bill of complaint against the Fidelity Loan and Savings Company, Incorporated, and the then directors and officers thereof, as well as all former directors and officers, with the exception of Julian T. Winfree, who had served as secretary and treasurer of the company from its organization until a short time before the institution of this suit.   At the same rules, but two days after the institution of the Williams suit, the Fidelity Loan and Savings Company filed its bill of complaint and made parties defendant thereto John Bagby, Charles E. Straus, Jr., R. H. Bruce, and Julian T. Winfree, who composed the executive committee of the board of directors at the time of the commission of the alleged grievances set forth in the bill.

There was a demurrer to this bill on the ground of lack of parties, which demurrer was sustained with leave to amend the bill of complaint, which was accordingly done, by making parties defendant thereto all of the then officers and directors, as well as all former officers and directors.   The prayer of the two bills of complaint was that the defendants be held liable for losses sustained by the Fidelity Company, by reason of the negligent manner in which its affairs had been conducted by the defendants.

On the 15th of November, 1921, the court entered a decree in the Williams suit, which provided as follows:   "And it appearing that there is another suit pending in this court under the short style of *Fidelity* Loan and Savings Company, Incorporated, v. John Bagby, and others, involving questions similar to

those raised in this suit, and the court being of opinion that these two causes should be heard together, it is further ordered that they hereafter be so treated."

The following decree was entered in the Fidelity suit simultaneously with the above quoted decree in the Williams suit: "And it appearing that there is another suit pending in this court under the short style of *Berta E. Williams* v. *Fidelity Loan and Savings Company, and others*, involving questions similar to those raised in this suit, and the court being of opinion that these two causes should be heard together, it is further ordered that they hereafter be so treated.

On the same day, November 15, 1921, the court also entered the following decree:

"*Berta E. Williams*

v.

*Fidelity Loan and Savings Company, Incorporated, and others,*

and

*Fidelity Loan and Savings Company, Incorporated,*

v.

*John Bagby, and others.*

"For reasons appearing to the court, it is ordered that the two above styled causes be hereafter heard and considered together."

Thereafter the two causes were "heard together" in that they were argued at the same time on the same depositions, taken after notice to all parties in both suits. The learned judge of the chancery court was "of opinion that the prayer for relief sought in the two bills ought to be denied." Accordingly, on January 21, 1924, the court entered a decree providing, among other things, as follows:

"* * * the court * * * doth adjudge, order and decree as follows:

"1. That the original bill, the amended bill, both as originally filed and as amended, and the amended and supplemental bill of complaint in the first named of these causes (the Fidelity suit) be, and the same are hereby, dismissed."

"2. That the bill of complaint in the second named of these causes (the Williams suit) be, and the same is hereby, dismissed."

We are of the opinion that Rule VIII, invoked by the Fidelity Company, has no application to the status asserted.

As applicable to the proceeding before this court, the word "appeal" refers to the appeal taken on behalf of Berta E. Williams, and the words "appellee or defendant" refer to the Fidelity Company, which is one of the appellees in this suit. This is necessarily true, for the reason that were the Fidelity Company suit before the court it would be the appellant, and not the appellee, or defendant.

The record discloses the fact that the Fidelity Company filed its answer in the Williams suit and prayed that the bill of complaint of Berta E. Williams be dismissed. By a decree entered January 21, 1924, the prayer is answered and the bill is dismissed. Upon the dismissal of her bill, Berta E. Williams perfected her appeal in this court. No action whatever was taken upon the part of the Fidelity Company to appeal from the decree dismissing its bill.

There could be no cross-error assigned by Fidelity Company as to the action of the court in dismissing the Williams bill, for the reason that the court dismissed the same upon the prayer of the Fidelity Company, and it would be strange, indeed, if it were per-

mitted to say, on cross-appeal, that the action of the court in this regard was erroneous. It does not confess error as to the decree in the Williams suit, but it seeks to hold the defendants to its bill liable on an appeal (not its own), and when some of the parties defendant to its bill are not parties defendant to the bill of Berta E. Williams (to-wit, Winfree).

In construing Rule VIII, Judge Whittle, in *Wheeler* v. *Thomas*, 116 Va. 267, 81 S. E. 54, said: "The decree of the Circuit Court of Fauquier county is made the subject of attack on one record in two separate appeals. The record, for that purpose, was divided, part of it was brought up by the appellants in the first appeal and the rest of it by the appellants in the second appeal (the positions of the parties being transposed in the two appeals).

"Ample provision is made by statute to have so much of the record as is necessary to fairly present the whole case to the appellate court brought up, and the right of the appellee to assign cross-error is safeguarded by Rule VIII of the rules adopted by this court. That is the usual and orderly method of procedure, and the practice pursued in this case is disapproved."

[2] It is further contended, however, that by virtue of the decrees entered, *supra*, that the Williams suit and Fidelity Company suit were consolidated, and therefore but one appeal was necessary in order for this court to dispose of all the questions involved in the two suits. We are of opinion that there is no merit in this contention. The mere fact that the chancellor decrees that two chancery causes shall be heard together, without specifically decreeing that the same shall be consolidated, is not sufficient to cause them to be considered as consolidated causes.

Professor Lile, in his Outline of Equity Pleading and

Practice (2d ed.), sections 341 and 342, clearly draws the distinction between *consolidation* and *hearing together* as follows:

[3] "Where several causes are technically consolidated, they become in effect a single suit, at least in so far as the circumstances of the several causes permit complete unity. The evidence in one becomes evidence in the other (subject of course to the control of the court to prevent injustice); the parties to one become parties to the other; and the cause proceeds for all purposes as if the several causes had been originally asserted in a single bill. It must be observed, however, that it is the proceedings that are consolidated and not the claims asserted, save where the latter belonged to the same plaintiff.

[4] "On the other hand, where there is a mere order of hearing together, unmodified, the suits remain as several as before, the only effect being that for convenience and economy the several steps toward the final disposition of the several causes are taken at the same time, and usually in the same decree. The parties to one are not necessarily parties to the other, and the evidence in one is not necessarily evidence in the other."

[5] In the last pronouncement of this court upon the subject, Judge Burks, in *Johnson* v. *Merritt*, 125 Va. 162, 99 S. E. 785, said: "The consolidation of several causes is a very different thing from hearing them together. It is sometimes convenient, economical and appropriate that two or more chancery causes should be heard together, but it has been seriously doubted whether any two chancery causes are so identical that they may be consolidated. The right to consolidate was doubted by Chief Baron Richards, in *Forman* v. *Blake*, 7 Price, 654, and was condemned by two out of

three judges of this court in *Claiborne* v. *Gross* and *Wimbush* v. *Gross*, 7 Leigh (34 Va.) 339. In *Barger* v. *Buckland*, 28 Gratt. (69 Va.) 850, 868, it is doubted if such consolidation can be made without consent. 2 Barton's Chy., page 861."

Coming now to the consideration of the Berta E. Williams suit, we find the pertinent facts to be as follows:

The Fidelity Loan and Savings Company, Incorporated (hereinafter called Fidelity), was chartered in the year 1912, and began business in the year 1913, with a paid in capital stock of $100,000.00. Fidelity was organized under what is known as the "Morris Plan," having paid Arthur J. Morris, the originator of the plan, for the privilege of operating under the same.

The question of whether or not Fidelity is a bank, or merely a loan company with certain other privileges attached, becomes an important one in the determination of the issues involved, and we deem it essential to set forth the purposes for which Fidelity was organized. The purposes stated in the charter are:

"(A) To carry on and transact a general loan business, to loan and invest moneys upon property or securities, real or personal, to issue, purchase or sell certificates, notes or other written evidences of indebtedness in such serial numbers and such denominations and under such conditions as the by-laws may provide, in a manner not inconsistent with the law, and in general to do any and all things pertaining to or incident to the transaction of any and all the matters and things aforesaid which may or can be legally done.

"(B) To purchase, sell, improve and deal in real estate or other property, real or personal, to acquire, hold, sell, lease and encumber all of its property, real or personal, taken by it as security or otherwise acquired by it in due course of its business.

"(C) To secure the payment of loans and the performance of all conditions upon which loans are made by taking security of any kind, or description, real or personal, or by mortgage, deed of trust upon real or personal property, or by transfer or pledge of its stock, notes or other evidence of indebtedness."

During the period from 1913 to the early part of 1919 John Bagby was president and Julian T. Winfree was secretary and treasurer. The executive committee was composed of John Bagby, Charles E. Straus and R. H. Bruce, and under the authority vested in them by the by-laws they had all powers of the board of directors, except the declaring of dividends. The capital stock of Fidelity was used in making loans to persons of small means but of good moral risk. This assumption of the moral risk was one of the main features of the Morris Plan. That the scheme was an excellent one is demonstrated by the results accomplished. In the first few years of its existence, after the payment of liberal dividends, Fidelity accumulated a surplus of $25,000.00, and did a total business of $3,000,000.00 with a net loss of not over $500.00.

Then came the entrance of the United States into the World War in 1917. Many young men, customers of Fidelity, were called into service, and the loan business, on that account, began to wane. In casting about for business, the executive committee found it profitable to make purchases of notes secured by deed of trust or other lien; and it likewise began to make loans on automobiles, taking either a lien on the machine, or a warehouse receipt as to the same.

On the 11th day of November, 1918, the war closed. By the middle of the year 1919 business of every kind was active. Money was plentiful. The activity in the automobile business was phenomenal. So intense

was the desire of the people to become car owners that many persons were willing to pay a premium for the privilege of becoming a purchaser. The demand was so great that the dealers merely booked their orders, and delivered the automobiles when possible. In numerous instances, the owner of a used car, desiring to purchase a new car, would trade in his old car at an agreed price, and pay the difference for the new car. The dealer would then repaint the old car, put it in good mechanical condition, and offer it for sale. Business was brisk and each sale added one more to the long procession.

In the fall of 1919, Fidelity received from the Industrial Finance Corporation of New York (hereinafter called I. F. C.), a concern which had been organized by Mr. Morris for the purpose of financing the loan companies operating under the Morris Plan, a proposition to enlarge its loan facilities. The plan suggested was that I. F. C. would send its solicitors to Richmond to build up large retail accounts in the automobile industry which I. F. C. would finance through its scheme of rediscounts. The Fidelity was thus to enlarge the scope of its business by making loans of sums of money to individuals, firms and corporations engaged in the sale of automobiles, accepting as collateral security with the notes of such dealers the hypothecation of their title to, and interest in, the cars purchased by them. At first this proposition of I. F. C. was rejected. Thereafter, at a meeting of the directors, Mr. Oliver J. Sands, who, in addition to being a director of Fidelity and a large stockholder thereof, was president of the American National Bank of Richmond, was directed to investigate the proposition made by I. F. C.

Mr. Sands did investigate, and at a meeting of the board of directors of Fidelity held on the 16th of October, 1919, the following action was taken:

"On motion duly made and seconded, it was ordered that no definite terms of contract should be entered into with the I. F. C. as to the handling of trade acceptances.

"On motion duly made and seconded, the president and secretary were empowered to negotiate a loan of $50,000.00 with the I. F. C. for a period of three months at a rate of interest not to exceed six per cent per annum, upon the terms as discussed between the secretary and Mr. Morris of the I. F. C.

"On motion duly made and seconded, the president and secretary were empowered to pledge as security for the above mentioned loan our weekly receivables in an amount not exceeding the sum of $70,000.00."

By the adoption of the plan of I. F. C., Fidelity was to receive an immediate loan of $50,000.00 and to receive a line of credit not exceeding $500,000.00. The form of the trade acceptance and trust receipt is as follows:

"INDUSTRIAL FINANCE CORPORATION
        "52 William Street, New York City.
"THE MORRIS PLAN

"THE MORRIS PLAN ACCEPTANCE."

"_____ _____ _____19_____
    (City)              (State)              (Date)

"On or before_____19____, pay to the order of Industrial Finance Corporation, $_____
_____Dollars, with interest from date of acceptance at six per cent per annum, and exchange and collection charges and reasonable attorney's fees (is allowed by law) if placed in the hands of an attorney for collection.

"To_____INDUSTRIAL FINANCE CORPORATION.
      Dealer

"_____    By_____
      Address

"TRUST  RECEIPT

"_____    _____    _____19____
    (City)    (State)    (Date)

"Received  of_____Bank  of
_____for Industrial Finance Corpora-
tion, on behalf of holder of acceptance of even number
herewith, which has this day been accepted by the
undersigned.

Bill of lading covering    Motor vehicle model_____
Serial No._____ with standard catalogue equipment
and attachments.

"In consideration thereof, it is agreed that the
undersigned will hold said property in trust as the
property of said Industrial Finance Corporation, for
the purpose of storing said property in a clean dry
place free of charge; that the undersigned has not the
right to, and will not operate or use said property of the
Industrial Finance Corporation for demonstration or
other purposes, nor loan, rent, mortgage, pledge, en-
cumber, sell or deliver said property except as auth-
orized herein; that the undersigned may sell said prop-
erty for the account of the Industrial Finance Corpora-
tion or holder of said acceptance, for cash or current
funds approved by Industrial Finance Corporation, in
amount not less than the sum then due on said ac-
ceptance, including interest; that the undersigned,
upon demand, prior to such sale, will return said prop-
erty unused and in good condition to the order of the

Industrial Finance Corporation; that in the event said property shall be sold as provided herein, the undersigned will hold the proceeds thereof in trust and separate from his (its, their) funds, and will forthwith account for and pay over said proceeds or sufficient thereof to satisfy said acceptances, with interest, to the Industrial Finance Corporation for the holder of said acceptance. It is understood that nothing herein shall prevent the undersigned, at the time he first takes possession of said vehicle, from driving it direct from warehouse, factory or railroad station to his place of business, but at his own risk (except in case of theft or fire) in the event of loss or damage to said car or to other property or to persons.

"Witness:            (Signed) _____ (Seal)

"Drawee-dealer.

"(Signed) _____          •

"By _____ -- ----

"Officer or firm member.

"Take notice—That no one has any authority to vary the terms of this Trust Receipt.

"(Copyright 1919, Industrial Finance Corporation— All Rights Reserved)

"We hereby certify that attached dealer's signatures are genuine.

"_____ Bank.

"By _____

Title.

"Accepted: _____ 19  .

"Payable at _____

"Dealer's Bank.

"_____ Address of Bank."

It will be observed, by the terms of this receipt, that the borrower of the money from Fidelity retained the possession of the automobile, but as the property of I. F. C. This was a departure from the former dealings upon the part of Fidelity in that it set aside the policy of loaning money on automobiles and taking a lien of the car as security, and substituted in the place thereof the retention of the car by the borrower, and the giving of trade acceptances and trust receipts.

Immediately after its entrance into this arrangement with I. F. C., Fidelity increased its loans with automobiles as security many thousands of dollars. The prosperity of the country was at its height. The demand for labor was in excess of the supply. Wages were enormous. The demand for new automobiles kept the factories in full blast. Dealers were finding ready sales for used cars.

In response to the report of the representatives of I. F. C. that loans to used car dealers would prove profitable, Fidelity decided on certain dealers as customers. As to the used cars hypothecated, the discount would be to the extent of seventy per cent of the appraised value. As to any new cars hypothecated I. F. C. would discount trade acceptances to the extent of eighty per cent of the invoice price of the car.

It was during this period, and under the circumstances narrated, that the executive committee made the loans which form the basis of this litigation, which loans were approved in every instance by the board of directors. So great was the increase in the business of Fidelity that Bagby, the president, was seeking an increase in salary. However, at a meeting of the directors and stockholders of Fidelity, held in January, 1920, Bagby was not re-elected president, and C. E. Straus was not re-elected vice-president. Then began

the period of financial depression throughout the nation. In May, 1920, I. F. C. was calling upon Fidelity for payment. By June, 1920, the business depression was acute; thereafter, it was desperate.

Due to the slump in the used car market and the subsequent insolvency of its borrowers, Fidelity incurred a loss of approximately $106,994.53.

In the scope of an opinion it is impracticable to discuss in detail the many questions contained in the record, which consists of more than seventeen hundred pages, nor to take up seriatim the many questions raised in the briefs of the eight counsel appearing in the case; the briefs covering more than five hundred printed and typewritten pages.

[6] Concretely stated, the contention of the appellant is that in making the following loans, to-wit:

| | |
|---|---|
| To Mullan Motor Company | $22,562.99 |
| Richmond Smith Form-A-Truck Company | 41,806.41 |
| J. C. Adams Motor Company | 6,186.25 |
| Armstrong Motor Company | 31,984.80 |
| W. F. Kinsey | 800.00 |
| King Wilson Motor Company | 350.00 |
| Richmond Oneida Truck Company | 1,956.33 |
| R. M. Kent | 1,347.75 |

the officers and directors of Fidelity were guilty of gross negligence, and that R. H. Bruce, a member of the executive committee, and vice-president, was guilty of improper conduct in securing said loans from Fidelity for compensation. After a complete examination of the record, we have come to the conclusion that the allegation in the bill of improper conduct upon the part of R. H. Bruce is not sustained by the evidence. That Bruce was not guilty of improper conduct was the view of the learned judge of the lower court, who

disposed of this feature of the case in a memorandum filed with the record, as follows:

"As to R. H. Bruce, much evidence has been taken and much argument used in an effort to show that Bruce, a director, also member of the executive committee, reaped large compensation from the borrowers of Fidelity in the making of the loans by Fidelity to dealers of used cars,. with the trade acceptance and trust certificate as security.

"In my judgment the evidence does not prove Bruce guilty of any such thing. For several years prior to 1919 Bruce, whose business is varied, had a licensed warehouse, in which many automobiles were stored and warehouse certificates issued; this as to both new and used automobiles. Many of these warehouse receipts were used by the holders thereof as security for loans at the various banks where the loans were obtained. The warehouseman obtained compensation, $2.50 or $3.00 each month for storage charges.

"In the storing of automobiles in this manner Bruce became well and favorably known among the automobile dealers.

"Bruce discontinued the warehouse business in 1919, and he denies having received any compensation from loans by Fidelity on any transaction. The borrowers from Fidelity also say they had paid Bruce warehouse storage charges on automobiles.

"Much stress is made of the fact that vouchers or checks to a large amount in the aggregate are shown to have been made payable to R. H. Bruce and used by him, and based on this fact it is urged that Bruce was a beneficiary in these transactions at the expense of the Fidelity. Bruce explained this matter fully and it was not contradicted. So far from being benefited personally, Bruce himself was used by Fidelity in such

matters for Fidelity's benefit. The substance of it is that time and time again, when Fidelity was not provided with funds to supply borrowers whose loans had been approved, Bruce was asked to give his own check, receiving therefor the check or voucher of Fidelity, which after holding for a brief period Bruce deposited and received credit for when paid. The practice of the exchange of checks by which Bruce's credit was used by Fidelity, without compensation or other benefit to Bruce, existed for some time, both before and after the change of management in January, 1920, when Mr. Kennerly became president."

It is disclosed by the record that the loans adverted to were made under the accompanying circumstances. We quote from the testimony of John Bagby as to the Mullan Motor Company loan:

"Mr. Winfree came in my office one morning in regard to the Mullan loan. He went over the matter with me and said he thought it was an excellent loan, and asked me what I thought about it. I told him I thought the loan looked as if it were good, but that I would have to have a meeting of the executive committee before the loan would be passed upon. A Mr. Nicholson came to the Fidelity to help install, as I understood it, the new plan and explain the same.

"Mr. Riely: Who was he?

"Witness: He was a representative of the Industrial Finance Corporation of New York. After he came here Mr. Winfree phoned me and said that he would like for me to meet Mr. Nicholson. I went to the Fidelity and met the gentleman, and there he and Mr. Winfree mentioned again the fact that they had the Mullan loan in contemplation and had it all lined up. I told them again that the loan looked as if it were all right, but that Mr. Straus was out of town and

he could not at that time come to the meetings, and as, soon as he came back I would call a meeting of the executive committee and we would take the matter up. The executive committee met at the office of the Fidelity on November 26th, if I am not mistaken, or the 27th, 1919, and went over considerable paper with Mr. Winfree, the secretary-treasurer, said that he had been asked to take under the new plan. Among other loans we found this loan of $36,000.00, as we understood it, to the Mullan Motor Company. We asked a good many questions about the loan and found out that the loan had been taken and the money passed out to the Mullan Motor Company. We were surprised to find this state of affairs, but we went over the matter carefully, as we thought, looked into the security, found that a good many of the notes were endorsed by the Alsop Motor Corporation. We knew that we had J. W. Seward's guarantee on the paper endorsed by the Alsop Motor Corporation to the extent of $25,000.00. Mr. Bruce and Mr. Winfree stated to the committee that they had, in addition to the security mentioned, a number of cars, probably eighty odd, as security for this loan, and that they had a statement from Mr. and Mrs. Mullan stating that their net worth was $20,000.00. At that time automobiles were selling at a premium, and while I, personally, did not know a great deal about cars, I was satisfied that any automobile, even second hand, at that time would bring from three to five hundred dollars each, and felt that we had security for the loan. We therefore approved the loan.''

As to the Richmond Smith Form-A-Truck Company debt, it appears that this company had one place of business in Richmond and one in Norfolk. They were dealers in new trucks, parts, etc. The president of this company was Robert M. Kent, Jr. Mr. Kent

was a citizen of Richmond, had seen long service in the banking institutions of the city and at the time of the loans to this company was vice-president and cashier of the Bank of Commerce and Trusts of Richmond.

Mr. Kent was the guarantor of these loans to the amount of $10,000.00. His integrity was above question and his company as a moral risk was excellent. Though it afterwards developed that Mr. Kent was heavily involved, at the time his apparent assets were regarded as being from $30,000.00 to $50,000.00. The evidence discloses the fact that the company was in good standing with other banks of the city. The loans made to it were made under the I. F. C. plan of financing automobile dealers; that is, trade acceptances and trust receipts were given and the line of credit extended the company was fixed by I. F. C. on a financial statement submitted by it.

In regard to this loan Mr. Bagby, the president of Fidelity, testified as follows:

"Q. You are also charged with negligence or improper conduct with regard to a loan to the Richmond Smith Form-A-Truck Company. State your knowledge of that loan, or loans.

"A. Mr. R. M. Kent, Jr., was connected with the Smith Form-A-Truck Company. I had known Mr. Kent for fifteen years; I was associated with him at the Capitol Savings Bank where I was chairman of the executive committee, and of all the men I have known in Richmond, I have never known one that I thought was more conservative than Mr. Kent. In addition to this, I knew that he owned property, and would have estimated it as worth from $30,000.00 to $50,000.00. With this information before me, I felt that when we were dealing with the Richmond Form-A-Truck Company, we were dealing with a concern which had with

it a very conservative, high-class man, and a safe man; and therefore I felt that we were safer with the Form-A-Truck Company—very much safer—than we would be with the average automobile dealer. The Fidelity had from Mr. Kent a guarantee against any losses sustained by the Fidelity in regard to any loans made to the Smith Form-A-Truck Company to the extent of $10,000.00. We loaned the Richmond Form-A-Truck Company on their open notes, my recollection is, about $12,500.00 or $13,000.00. The rest of the loans made to this Smith Form-A-Truck Company, or my understanding of the rest of the loans that were made to them, was that they were on new cars taken over under the Morris Plan under trust receipts and trade acceptances. I understand that later, after I left the institution, the money for some of the cars that were held under these trust receipts was misappropriated.

"Q. Do I understand you to say that the loan of $12,500.00 was made on the notes of the Form-A-Truck Company, and also on the guarantee to the amount of $10,000.00, by Mr. Kent?

"A. Yes, sir.

"Q. The balance of the loan was made, I understood you to say, as far as you knew, upon new cars; is that correct?

"A. New cars as far as I know; that is correct.

"Q. Do you know who valued the cars; or were they valued by the bills of lading, or not?

"A. I am inclined to think that those cars were valued under the bills of lading, and taken under the Morris Plan, using the trust receipt."

The Armstrong Motor Company was a partnership composed of D. D. Armstrong and W. F. Kinsey. This company had been a customer of Fidelity prior to the loans secured under the I. F. C. arrangement. The

loans to this company were, in the main, made on the security of new automobiles.

The credit extended to the J. C. Adams Motor Company was solely under the I. F. C. arrangement of trade acceptances and trust receipts.

The record is not clear as to the debt of W. F. Kinsey, but it is alleged that this loan was made on the security of a note of one E. F. Morten and a trust receipt covering a Stutz car.

The debt of the Richmond Oneida Truck Company has been assumed by R. H. Bruce, and, as shown by the record, is being liquidated by him.

The R. M. Kent, Jr., debt of $1,347.75 was a personal loan made on September 2, 1920, and seems to be covered by the moral assumption risk under the "Morris Plan."

[7] This brings us to a consideration of the following very pertinent questions:

(a) From what standpoint should the actions of the officers and directors of the Fidelity be viewed?

(b) Was the Fidelity a banking institution under the Virginia statute?

(c) What is the degree of care required of an officer or director of a bank or loan institution?

(d) Is an officer or director of a bank or a loan institution a trustee or agent?

(e) Were the officers and directors of Fidelity recreant in the discharge of the duties resting upon them?

(a) In disposing of this question, we are impressed with the outstanding feature of this case, viz., that the bill of complaint makes no allegation of fraud, corruption or profit as to any of the defendants save R. H. Bruce, and we have seen that this charge is not supported by the evidence. These defendants are men of the highest character, as is conclusively shown by the

3

record.   They were stockholders in the Fidelity Company and upon their good fatih and judgment the success of the company depended.   To them success meant dividends; they had every incentive to loan their own money—the capital stock—cautiously. From the past success of Fidelity under the management of Bagby, Straus, Bruce and Winfree, the directors may be pardoned (if not held blameless) for being lulled into a state of security.

The spirit of the times was a potent factor in every financial transaction.   In the press, on the rostrum, in the pulpit, on the street, in the office, in the factory, the word most often spoken was "prosperity."

It is natural, therefore, that the plan of the Industrial Finance Corporation should appeal to those flushed with success.   To state that the plan was an ignominious failure is to state the case mildly.   In no event would a court of equity have approved the loans made.   In a sense, however, the loans made were personal, in that the money parted with was not the money of depositors, as is ordinarily the case in matters of this kind, but the money of stockholders.   Should the appellant prevail, she would be one of the few stockholders who would not be called upon to take money out of one pocket in order to replenish the other pocket.

Such were the circumstances under which the loans were made, and it is under these circumstances that the defendants should be judged.   That they erred in their judgment is too apparent to afford discussion. Yet error of judgment is all that can be charged against them.

[8] (b) Was Fidelity a banking institution?

It is charged that the defendants violated section 4115 of the Code, which provides, among other things,

that not more than twenty-five per cent of the capital stock and surplus shall be loaned to one person. Section 4115 is found in the Code under the head of "banks of discount and deposit." The record discloses that Fidelity was in no sense a receiver of deposits; that this is true is evidenced by the fact that the recipients of the loans did not deposit the amounts loaned them in Fidelity but in some banking institution; no checks were drawn on any funds in the keeping of Fidelity, no certificates of deposits were issued in conformity with established banking rules; no savings accounts were accepted; no examination of its affairs was made by the State examiner of banks; it was not under the supervision of the State Corporation Commission as all of the State banks are.

There is no merit in this contention.

[9] (c) What is the degree of care required of an officer or director of a bank or loan institution?

In *Marshall* v. *Farmers' & Mechanics' Savings Bank of Virginia*, 85 Va. 676, 8 S. E. 586, 2 L. R. A. 534, 17 Am. St. Rep. 84, Judge Lacy held: "Directors are not merely bound to be honest, they must also be diligent and careful in performing the duties they have undertaken. They cannot excuse imprudence on the ground of their ignorance or inexperience, or the honesty of their intentions, and if they commit an error of judgment through mere recklessness, or want of ordinary prudence and skill, the corporation may hold them responsible for the consequences.

"We find the settled rule upon this subject well stated in a recent work of great practical usefulness. The American and English Encyclopaedia of Law, under the head 'banks,' speaking of directors, says: 'The directors of a bank have the general control and government of its affairs, and constitute the corporation.

They are bound to exercise ordinary skill and diligence, and are liable for losses resulting from mismanagement of the affairs and business of the bank.' There it is further said:  'But for excusable mistakes concerning the law, *and for errors of judgment when acting in good faith*, they are not liable."

In *Briggs* v. *Spaulding*, 141 U. S. 148, 711 S. Ct. 929, 35 L. Ed. 662, referring to the responsibility of the directors to stockholders, Mr. Chief Justice Fuller said: "We are dealing now with their responsibility to stock-holders, not to outside parties—creditors and deposi-tors. It is unnecessary to consider what the rule may be as to them. *Upon a close examination of all the re-ported cases, although there are many dicta not easily reconcilable, yet I have found no judgment or decree which has held directors to account, except when they have them-selves been personally guilty of some fraud on the corpora-tion, or have known and connived at some fraud in others, or where such fraud might have been prevented had they given ordinary attention to their duties.* I do not mean to say by any means that their responsibility is limited to these cases, and that there might not exist such a case of negligence or of acts clearly *ultra vires*, as would make perfectly honest directors personally liable. *But it is evident that gentlemen selected by the stockholders from their own body ought not to be judged by the same strict standard as the agent or trustee of a private estate.* Were such a rule applied, no gentleman of character and responsibility would be found willing to accept such places." (Italics added.)

In 7 C. J. 788, the rule is thus stated: "The degree of care to which the bank directors are bound is that which ordinarily prudent and diligent men would exer-cise under similar circumstances."

In *Winston* v. *Gordon*, 115 Va. 912, 80 S. E. 761,

Judge Keith quotes with approval the rule laid down in 1 Morawetz on Private Corporations, at section 552: "Attempts have been made to define the degree of care and prudence which directors must exercise in the performance of their duties. In some of the cases it has been said that inasmuch as directors are usually not paid for their services, they are to be regarded as mandataries—persons who have gratuitously undertaken to perform certain duties, and are bound to exercise only ordinary care and prudence. But all this is at the best misleading. The plain and obvious rule is that directors impliedly undertake to use as much diligence and care as the proper performance of the duties of their office require. What constitutes a proper performance of the duties of a director is a question of fact, which must be determined in each case in view of all the circumstances—the character of the company, the condition of its business, the usual methods of managing such companies, and all other relevant facts must be taken into consideration."

While there is great conflict in the authorities as to how the question should be answered, we think the answer should be "that the directors must exercise ordinary care and prudence in the administration of the affairs of a bank or loan institution, and that the degree of ordinary care required depends upon the facts and circumstances of the particular case." See *Briggs* v. *Spaulding*, 141 U. S., p. 146, 11 S. Ct. 935, 35 L. Ed. 662.

[10] (d) Is an officer or director of a bank or loan institution a trustee or agent?

In the *Marshall Case, supra*, dealing with a similar question, Judge Lacy said: "The high degree of confidence and responsibility resting upon directors of corporations has often led the courts to regard them as

trustees, and to declare the relationship existing be-
tween them and the stockholders to be that of trustees
and *cestuis que trustent*, respectively.    If this can be
asserted with regard to the generality of corporations,
it is peculiarly and exceptionally true with regard to
banking corporations.    The directors of a bank are
not trustees for the stockholders alone, but they owe
an even earlier duty to the depositors.    The law is, as
it ought to be, very jealous in exacting the strict and
thorough performance of these duties, and it is in the
scrutiny of possible breaches of them that the rigid
rules which govern trustees have been applied.    It is
not enough to exculpate a director that no actual dis-
honesty can be shown; that he cannot be positively
proved to have been influenced by interested motives."

In *Saunders* v. *Bank of Mecklenburg*, 113 Va. 656, 75
S. E. 94, Judge Keith, who had decided the *Marshall
Case* in the lower court, stated that the case was weak-
ened by the fact that two of the judges dissented and a
third concurred only in the results.

In *Camden* v. *Virginia Safe Deposit Company*, 115
Va. 26, 78 S. E. 596, Judge Keith, without any reference
whatever to the *Saunders Case, supra*, quotes without
comment the doctrine laid down by Judge Lacy in the
*Marshall Case, supra*.    However, when called upon in
the case of *Winston* v. *Gordon* to pass upon the status
of directors of a bank, he said:    "This brings us to the
consideration of the statutes of limitation    *    *    *
pleaded in this case.    The court of law and chancery
*    *    *    sustained the plea of three years limitation,
and this action is assigned as error by the appellants,
who insist that *the directors of a bank are trustees*, and
that there is no statutory bar to a suit against them for
misconduct in the execution of their trust.

"There are doubtless many cases in which directors

are spoken of as trustees, and in a general sense they are trustees, but they are to be more accurately described as agents without compensation, who are *responsible for the exercise of reasonable care in the performance of their duties.*" *Winston* v. *Gordon,* 115 Va. 899, 80 S. E. 756.

In *Spering's Appeal,* 71 Penn. St. 11, 20 (10 Am. Rep. 684), Judge Sharswood, speaking for the court, said: "It is by no means a well settled point what is the precise relation which directors sustain to stockholders. They are, undoubtedly, said in many authorities to be trustees, but that, as I apprehend, is only in a general sense as we term an agent or any other bailee entrusted with the care and management of the property of another. It is certain that they are not technical trustees. They can only be regarded as mandataries— persons who have gratuitously undertaken to perform certain duties, and who are therefore bound to apply ordinary skill and diligence, but no more. We are dealing now with their responsibility to stockholders, not to outside parties—creditors and depositors. It is unnecessary to consider what the rule may be as to them. Upon a close examination of all the reported cases, although there are many dicta not easily reconcilable, yet I have found no judgment or decree which has held directors to account, except when they have themselves been personally guilty of some fraud on the corporation, or have known and connived at some fraud in others, or where such fraud might have been prevented had they given ordinary attention to their duties. I do not mean to say by any means that their responsibility is limited to these cases, and that there might not exist such a case of negligence or of acts clearly *ultra vires,* as would make perfectly honest directors personally liable. But it is evident that

gentlemen selected by the stockholders from their own body ought not to be judged by the same strict standard as the agent or trustee of a private estate. Were such a rule applied, no gentlemen of character and responsibility would be found to accept such places."

This case is cited with approval by Mr. Chief Justice Fuller in *Briggs* v. *Spaulding, supra.* In the latter case we also find this language: "Bank directors are often styled trustees, *but not in any technical sense. The relation between the corporation and them is rather that of principal and agent,* certainly so far as creditors are concerned, between whom and the corporation the relation is that of contract and not of trust."

While there appears to be much conflict as to the status of a director, we think the weight of authority sustains the position taken by Judge Keith in the case of *Winston* v. *Gordon, supra,* and that the correct rule is that a director of a bank or loan institution is an agent and not a trustee. In so far as the rule laid down in the *Marshall Case* is in conflict with the rule here stated, the same is overruled.

(e) Were the officers and directors recreant in the discharge of the duties resting upon them?

The loans having been made under the circumstances detailed, the question must be answered in the negative.

It follows that the decree of the Chancery Court of the city of Richmond here complained of has to be affirmed.

*Affirmed.*