L. S. Anderson, et als. v. T. L. Bundy, et als.

September 21, 1933.

Present, Holt, Epes, Hudgins, Gregory and Browning, JJ.

4

The opinion states the case.

*W. B. Kegley* and *A. F. Kingdon,* for the appellants.

*B. T. Wilson* and *W. W. Bird,* for the appellees.

HOLT, J., delivered the opinion of the court.

In this suit an attempt is being made to hold directors liable for negligence in the administration of the affairs of their bank. There was a decree for the defendants. Plaintiffs have appealed.

In the village of Cleveland, the People's Bank of Cleveland was established in 1907 and continued in operation

until May 10, 1928, when it was forced to suspend and a receiver was appointed. Its paid in capital was $10,000. Taking its record at its face value there was a surplus in 1922 of $5,000 with $531.93 to the credit of undivided profits. In 1923 the surplus was $6,000; undivided profits $40.31. In 1924 the surplus was $7,000, and undivided profits, $2.97. In 1925 surplus was $9,000 and undivided profits $42.73. In 1926 surplus was $10,000 and undivided profits $93.76. In 1927 the surplus was $10,000 and undivided profits $78.84. And finally in 1928 the surplus was still $10,000 with undivided profits $17.93. In 1922 a ten per cent dividend was declared; in 1923 a fifteen per cent dividend; in 1925 a six per cent dividend, and in 1926 a ten per cent dividend. No dividends were paid in 1927 or 1928. Net profits for 1922 were $1,508.38; for 1923, $2,462.66; for 1924, $2,039.76; for 1925, $1,407.83; for 1926, $921.25, while for 1927 there was a loss of $60.65.

From the minutes of its board these gentlemen appear as members of the board of directors: In 1920, T. L. Bundy (president), M. A. Thompson, J. S. Tate and J. B. Kennedy. In 1924, T. L. Bundy, J. S. Tate, P. H. Bundy and E. F. Jessee constituted the board. From the 10th of January, 1925, to the 9th of January, 1926, T. L. Bundy, P. H. Bundy, M. A. Thompson, J. S. Tate and E. F. Jessee made up the board. They continued in office until the 15th day of January, 1927. From that date until the bank closed the board was made up of T. L. Bundy, J. S. Tate, M. A. Thompson, E. L. Musick, W. A. Jessee, C. B. Jessee and E. F. Jessee.

To complainants' bill T. L. Bundy, J. S. Tate, P. H. Bundy, M. A. Thompson and E. L. Musick demurred and answered. There was an amended and supplemental bill to which they again demurred and there was afterwards a second amended supplemental bill. On March 10, 1932, the trial court, holding with the defendants, dismissed this cause and ordered it to be stricken from the docket.

In January, 1920, E. F. Jessee was employed as cashier and continued in that office and as the executive officer

of the bank until its final suspension. He was a young man, amply competent, of pleasing address, and then of good reputation, although he had no property of moment.

It is charged that he ran this bank with the single purpose of promoting the interest of himself, his kins-people and associates; that over him his board exercised no real supervision; and that this situation continued until the institution was wrecked.

The defendants claim that they did, with due care, superintend the operations of their bank, and that its failure was due to change of business conditions in its vicinity, to the falling away of customers and to embez-zlements by the cashier which were not known to them and could not have been known by them in the exercise of ordinary care.

In 1920 this cashier became interested in the Jessee Department Store, No. 1, at Cleveland, a partnership composed of J. S. Jessee, his father, W. A. Jessee, his uncle, and C. B. Jessee, his cousin. In 1922, he, together with W. A. Jessee, J. A. Jessee and C. B. Jessee bought the merchandise of Kingsport Stores Corporation at Clinchfield, agreeing to pay therefor $40,000. In 1923, he, with W. A. Jessee, J. A. Jessee and C. B. Jessee, opened a drug store. In the same year he, with C. B. Jessee and S. J. Scordas, opened a pool room. In the same year, with W. A. Jessee and C. B. Jessee, he opened another pool room and a barber shop. In 1924 he went into part-nership with M. T. Kiser, under the name of Kiser & Co. About the same time he, with C. B. Jessee, went into the bottling business, under the name of Cleveland Bot-tling Company. He went into the poultry business with A. M. McReynolds, and he went into the poultry business with A. R. Jessee. He went into another poultry business with C. B. Jessee, W. A. Jessee, J. C. Tate and S. J. Cody. He went into business with W. A. Jessee, J. A. Jessee and C. B. Jessee under the style of Cleveland Motor Company. In 1925 he went into business with W. A. Jessee. J. A. Jessee, C. B. Jessee and M. C. Looney under the name of

Jessee Furniture Company. With C. B. Jessee he operated the Jewell Theatre, and also with him they opened up another pool room and barber shop and possibly he again ventured into the poultry business.

All of these undertakings must have been known to the directors, centering as they did around a community in which the bank was and where they lived. He built for himself a handsome home. Needless to say they were failing ventures and all of the Jessees are now bankrupt.

As indicative of the confidence placed in this cashier, he was by the board of directors, on February 21, 1925, authorized to borrow unlimited sums of money and that authority was never revoked, although in December, 1926, he was arrested for unlawfully passing counterfeit money. After the bank failed he confessed and was sent to the penitentiary.

T. L. Bundy was president, Tate was vice-president. There were monthly meetings of the board as provided for by statute (Code, section 4149 (23)), and twice each year (Code, section 4149 (24)), examinations, called for by statute, of the bank's affairs were had. It is claimed that the cashier's reports were examined with care and that at each meeting the minutes of the preceding meeting were read and approved. In short, these gentlemen contend that the duties which devolved upon them at monthly meetings were properly performed and that they semi-annually examined generally the affairs of their bank.

The cashier, E. F. Jessee, is an embezzler and a convict. He tells us that he wrote up minutes of the directors' meetings, and that as written by him they were accepted and signed without any real examination at all. This the directors deny, but Jessee's testimony is intrinsically supported by the minutes themselves. From them it appears that C. B. Jessee was present as a director of the meeting of December 22, 1927, and in his capacity as director signed the record of that meeting. The same is true of the meeting of October 22, 1927; of the meet-

ing of September 24, 1927; of the meeting of August 20, 1927; of the meeting of July 23, 1927; of the meeting of June 25, 1927; of the meeting of February 19, 1927; and of the meeting of January 22, 1927. C. B. Jessee appears to have been elected a director at a meeting on January 15, 1927. He never qualified and was never present at any of these meetings, and, as we shall further see, these directors have no real recollection about the extension of an extraordinary line of credit to J. A. Jessee, to W. A. Jessee and to C. B. Jessee.

The loans to these Jessees is a matter of major importance. Certainly they in a large measure brought about ultimate bankruptcy.

By Acts of 1920, pages 818, 820, chapter 491 (section 4115), it is provided that the liability of no person, partnership or corporation shall exceed twenty-five per cent of the bank's capital and permanent surplus unless authorized by a majority of the board of directors and recorded in its minutes.

This statutory limitation was afterwards changed. Acts 1928, pages 1324, 1325 (section 4149 (47)). The limit is now fifteen per cent of capital and surplus with this further limitation, that it shall in no case exceed forty per cent of it.

Apparently to meet the requirements of the act of 1920, the minutes of August 22, 1925, were adopted. They are here copied in their entirety.

"The board of directors of the Peoples Bank of Cleveland, Incorporated, located at Cleveland, Russell county, Virginia, convened in regular monthly meeting, at 3:00 o'clock P. M. on Saturday, August 22, 1925, with T. L. Bundy, president, presiding. The following members of the board were present:

"T. L. Bundy,
"P. H. Bundy,
"J. S. Tate,
"M. A. Thompson,
"E. J. Jessee.

"Minutes for the previous meeting were read and passed as approved.

"All paper was carefully gone over, collateral, and names as maker and endorsers, examined, and discussed at length. No objections were entered as to the value of the paper, it being agreed by everyone, that our paper was in good shape, and perfectly good, so far as we are able to determine.

"By an unanimous vote, the following names were approved for the respective amounts, as both maker and endorser, opposite their names.

| Name. | As Maker. | As Endorser. |
|---|---|---|
| W. H. Ferguson | $ 7,500.00 | $ 2,000.00 |
| C. C. Clay | 8,000.00 | 5,000.00 |
| G. Rasnake | 5,000.00 | 5,000.00 |
| Scott Litton | 15,000.00 | 15,000.00 |
| Geo. A. Pepper | 15,000.00 | 15,000.00 |
| A. W. Taylor | 15,000.00 | 15,000.00 |
| Lake George Shell Corporation | 15,000.00 | |
| H. J. Tate | 5,000.00 | 10,000.00 |
| M. A. Thompson | 8,000.00 | 8,000.00 |
| Lee Long | 6,000.00 | |
| W. H. Ferguson | 6,000.00 | 3,000.00 |
| J. A. Jessee | 15,000.00 | 15,000.00 |
| W. A. Jessee | 15,000.00 | 15,000.00 |
| C. B. Jessee | 15,000.00 | 15,000.00 |
| M. A. Thompson | 15,000.00 | 5,000.00 |
| J. R. Purcell | 7,500.00 | 2,000.00 |
| J. E. Purcell | 7,500.00 | 2,000.00 |

"After the discussion of further minor details the meeting was then adjourned.

> "(Signed)   T. L. BUNDY,
>        *President-Director,*
> "(Signed)   M. A. THOMPSON,
>        *Vice-President-Director,*
> "(Signed)   P. H. BUNDY,
>        *Director,*
> "(Signed)   J. S. TATE,
>        *Director.*

"(Signed)   E. F. JESSEE,
    *"Secretary-Director."*

In their answer defendants, referring to this resolution set out in the bill, said: "These respondents not only never agreed to, but never heard of, any such resolution or any such loans, and the entry of the authorization of any such loans, in the minutes of the meeting of the board of directors referred to in said paragraph, over the signatures of respondents, T. L. Bundy, president-director, M. T. Thompson, vice-president-director, P. H. Bundy, director, and J. S. Tate, director, was falsely and fraudulently done, without the knowledge or consent of these respondents, whose attention was never drawn to this false entry in the minutes of this meeting until this suit was instituted, because there was nothing more than the usual routine business transacted at this meeting, and there was never any occasion to return to, and examine, the minutes thereof after meeting was adjourned."

Referring to this same resolution appellees in their reply brief, say:

"While these defendants do not recall authorizing such credit, and there appears on a close inspection of the record of this minute some things that indicate that this authorization was fraudulently written into the minute without the observation, knowledge or consent of these defendants, whose signatures appear at the end of the minute, the evidence conclusively shows that the several Jessees and others to whom the minutes authorizes credit, as therein named, were respectively good for the amounts there stated; and there was no violation of law or failure to properly appraise the financial worth of the several parties mentioned."

In other words, as a matter of fact, they do not remember anything about it.

It is impossible to reproduce the pictorial effect of this minute. The alignment and the ribbon, as shown by the type, lead us to believe that the first and the last three names on this list and their credits were added afterwards, but the remainder of it was written at the same time. The same type is clogged in the same places and

the alignment of all the other names and credits is perfect. Moreover, it is not to be presumed that so large a space would have been left blank. Nowhere in any other minute of any other meeting does any blank occur.

On January 15, 1927, a loan committee was elected and directed to pass on all loans in excess of $500 which would indicate that previous to that time there had been no such limitation on the cashier's authority. After that time, so far as the records show, but three notes came before the board; a loan of $4,200 to the Jessee Furniture Company, a loan of $3,000 to the Jessee Furniture Company, together with this entry: "The name of E. F. Jessee is hereby authorized for an additional loan of $4,000 in order to permit him to take up notes of A. M. Runnels, bankrupt, upon which he was liable."

After the bank failed C. J. Stull, an expert accountant, was called upon to examine into a report upon the bank's affairs. There was then in hand loans and discounts amounting to $203,732.02.. Of this sum the cashier, his kinsmen, and associates, were liable as makers in the sum of $86,354.84, and as endorsers in the sum of $15,-393.31, so that their total liability was $101,748.15. Of this sum $28,660.15 was represented by fraululent notes put by the cashier in the bank to cover his embezzlements.

The bank was overloaned and the State Bank Examiner was complaining because of that situation. To relieve the bank from this criticism Mr. C. C. Burns, a stockholder, and T. L. Bundy, president, opened a special account, known in the record as T. L. Bundy, No. 2 account. They would purchase notes from the bank, paying therefor in cash. These notes then went off the record. But if they were not paid they were returned to the bank and taken up by it. Of course, if a note was bad and if it was not paid to Burns and Bundy it would have been bad had it remained in the bank, and so the bank lost nothing by the transaction. But it was misleading in that through it there appeared to have been a reduc-

tion in bank loans which was not in fact always the case. And this is not affected by the fact that Burns and Bundy had as their major purpose an intention to aid the bank and in their efforts to do so actually suffered loss. It might have helped the bank but it would have misled a possible depositor as to its condition.

There were other irregularities. On November 14, 1927, E. F. Jessee and T. L. Bundy borrowed on their individual notes, from William E. Burns $16,000, and pledged as collateral therefor the bank's own notes. It is true that this money was borrowed for the bank, but since Jessee and Bundy were makers of the notes it did not appear in the bank's statement as a bank liability. When Bundy was asked if there was any explanation which he could give for putting up bank assets as collateral for his notes, he said: "I have explained it as best I can. Jessee was the whole shooting match I think."

There are other instances of the same general character. As early as October 17, 1925, they purchased a note or notes of E. F. Jessee amounting to $12,382.83. Collateral belonging to the bank was deposited as security.

At a board meeting on May 22, 1926, overdraughts were reported amounting to $152.36. As a matter of fact overdraughts on that date were $3,557.14. T. L. Bundy's overdraughts at that time alone amounted to $379.91.

On November 22, 1927, overdraughts reported amounted to $297.50. They were in fact $6,970.27. Bundy's overdraughts then amounted to $2,110.47. When the bank was closed overdraughts amounted to $3,151.75.

Published statements were equally misleading. For example that of December 31, 1927, shows overdraughts $185.53. On the 22nd of that month they were $3,150.12. That of October 10, 1927, shows overdraughts, $360.90. They were on the 22nd of that month $6,185.36, and on the 24th of the preceding month, $2,626.68.

This state of affairs continued without interruption from May 26, 1926, until the bank suspended, and yet

semi-annual examinations of the bank's affairs, which we are told were painstaking and thorough, did not uncover them, although the president knew from the condition of his own account that the cashier's reports were incorrect. Why the State Bank Examiner did not uncover them we do not know. Mr. Stull did promptly and without any trouble at all. At the end about all the paper which anybody would rediscount had been rediscounted. It amounted to $68,562.57. Paper past due and unpaid amounted to $59,863.53. During this time these directors thought that they were carrying the Jessees for about $20,000 as primary liabilities and for about $10,000 as endorsers.

The cashier's methods of embezzlement do not appear to have been particularly subtle. Reduced to its simplest form he would steal $1,000 and put into the bank John Doe's note, promising to pay this $1,000. This note was entered on the record of the day's transactions but was not shown to the board and since the board did not undertake to check its loans, discounts and cash against capital, surplus and deposits, its existence was never known. Just how Jessee dealt with the bank examiners is a matter of speculation. He probably put these notes before them and thus brought his accounts into balance. The examiner could not readily know whether they were good or worthless, but he, too, must have known that there was an unconscionable amount of Jessee paper in the files—something over $86,000 in amount, in addition to their endorsements.

When Jessee was arrested for passing counterfeit money uneasiness followed, or should have followed. The directors say that he had their entire confidence and had the confidence of the community, and that upon conference with men upon whose judgment they had a right to rely they reached the conclusion that to suspend or dismiss him would do more harm than good; but they did also reach the conclusion that it would be well to put someone in the bank with him that he might be watched,

and so they put Mr. Tate. While Mr. Tate is doubtless an upright gentlemen he was without experience and perfectly incompetent. His presence was worth less than nothing, for it was a statement to the public that precautions were being taken, when none of any value whatever had been taken. If it had any effect upon Jessee at all it was to notify him that he must make hay while the sun shone. And he did.

It will be impossible within any reasonable limits to discuss the various items running through these accounts. The record covers 750 pages of printed matter and there is a soap box full of exhibits. We do not mean to say that any one of the irregularities was sufficient to put the directors on notice, but read together they lead us irresistibly to the conclusion that they were sufficient to require an examination which was one in fact.

It is said that the Jessees were reputed to be wealthy and successful. No one of them in any year paid a personal tax on as much as $300, and while they owned considerable real estate there were some judgments covering it. But good or bad no bank managed with fair judgment would lend almost half of its assets to its cashier and his associates. The truth is this was a one-man bank. As the president said in undertaking to explain how it came to pledge its assets as collateral for an individual's note: "Jessee was the whole shooting match, I think." These directors had confidence in their cashier and relied upon him to conduct the business. They were men without banking experience and personally profited by nothing which was done. But that is not enough. Men without qualifications should not undertake to act as directors, and if they do they must bear burdens which are incident to obligations they voluntarily assume.

Of course a bank must have an executive officer, and many of the details of management must be left to him. He cannot call his board together every time a man in the ordinary course of business wants a loan, but they should keep themselves advised as to what loans are

made and that, as we have seen, was a simple matter and appeared upon the record of each day's transactions. In this case the net result of all done is that the depositors will receive about twenty-five per cent of their claim.

It is sometimes said that the measure of duty due by directors to their stockholders and to their bank differs from that due to depositors. In the first case ordinary care is the test. In the second case loss must have been occasioned by some malicious or fraudulent act, or at the least, by gross negligence. 1 Morse on Banks and Banking (6th Ed.) section 130; *Hart* v. *Evanson,* 14 N. D. 570, 105 N. W. 942, 3 L. R. A. (N.S.) 438; *Fusz* v. *Spaunhorst,* 67 Mo. 256. They hold that depositors are but creditors of the corporation and utter strangers to the obligations of the directors to it.

It is everywhere conceded that a receiver can recover where there has been a want of ordinary care. He represents every interest. If he refuses to sue, creditors are subrogated to his rights and may. There is no good reason why they should not be permitted to succeed to all of his rights.

In *Williams* v. *Fidelity Loan & Sav. Co.,* 142 Va. 43, 128 S. E. 615, 624, 45 A. L. R. 664, it was held that directors were not technical trustees. Mr. Justice Campbell was of opinion that they were agents, and in support thereof cites this statement of the law from *Briggs* v. *Spaulding,* 141 U. S. 132, 11 S. Ct. 924, 35 L. Ed. 662: "Bank directors are often styled trustees, but not in any technical sense. The relation between the corporation and them is rather that of principal and agent, certainly so far as creditors are concerned, between whom and the corporation the relation is that of contract and not of trust."

In *Winston* v. *Gordon,* 115 Va. 899, 80 S. E. 756, 761, this court said: "There are doubtless many cases in which directors are spoken of as trustees and in a general sense they are trustees, but they are to be more accurately described as agents without compensation,

who are responsible for the exercise of reasonable care in the performance of their duties."

■ We have already held that bank directors are not technical trustees but agents. With the status of agency established it is settled law that something less than gross negligence is the measure of duty.

*Marshall* v. *F. & M. Savings Bank, etc.,* 85 Va. 676, 8 S. E. 586, 2 L. R. A. 534, 17 Am. St. Rep. 84, was a suit brought by Marshall and other creditors to reduce into possession and to distribute assets of a bankrupt bank. Directors were charged with negligence. The court held that they were negligent in fact and sustained a recovery against them. While this case has been overruled by the *Williams Case* in its holding, in effect, that a director was a trustee, the *Marshall Case* still stands as authority for the maintenance of such a unit.

In *Winston* v. *Gordon, supra,* directors are spoken of as agents without compensation. This statement must not be taken too literally. They do usually receive compensation, small it is true, but we know of no rule which requires less fidelity from an agent who is paid $10 than from one who is paid $20. Moreover, indirect benefits should be considered. Their character is a matter of common knowledge.

■ "It is plain that the expression 'gross negligence' is loosely used in many of the judicial decisions, and that it is sometimes used as the mere antithesis of a 'want of ordinary care'." *Hun* v. *Cary,* 82 N. Y. 65, 37 Am. Rep. 546; *United Society of Shakers* v. *Underwood,* 9 Bush (Ky.) 609, 15 Am. Rep. 731.

"Few persons would be willing to deposit money in savings banks, or to take stock in corporations, with the understanding that the trustees or directors were bound only to exercise slight care, such as inattentive persons would give to their own business, in the management of the large and important interests committed to their hands. When one deposits money in a savings bank, or takes stock in a corporation, thus divesting himself of the

immediate control of his property, he expects, and has the right to expect, that the trustees or directors, who are chosen to take his place in the management and control of his property, will exercise ordinary care and prudence in the trusts committed to them—the same degree of care and prudence that men prompted by self-interest exercise in their own affairs." *Hun* v. *Cary, supra; Warren* v. *Robison,* 19 Utah 289, 57 Pac. 287, 75 Am. St. Rep. 734.

*Delano* v. *Case,* 17 Brad. (17 Ill. App.) 531; *Id.,* 121 Ill. 247, 12 N. E. 676, 2 Am. St. Rep. 81, was an action brought by a general depositor against the directors of a bank. It was said that those directors were "bound to the observance of ordinary care and diligence."

In *Lippitt* v. *Ashley,* 89 Conn. 451, 94 Atl. 995, 999, the rule is thus stated: "Bank directors, in their relation to the corporation, its creditors and depositors, occupy a fiduciary position. Many authorities regard them as trustees, others as not technically trustees, but all agree that by accepting the office they become obligated to exercise reasonable care and prudence in the discharge of their duties." *Solomon* v. *Bates,* 118 N. C. 311, 24 S. E. 478, 54 Am. St. Rep. 725.

We reach without hesitation the conclusion that directors must exercise ordinary care and prudence in the protection of their depositors.

*Briggs* v. *Spaulding, supra,* is probably the leading case in this country on this subject and is very generally relied upon by all who deal leniently with directors. The opinion in that case is by Chief Justice Fuller. It concludes with this statement:

"Without reviewing the various decisions on the subject, we hold that directors must exercise ordinary care and prudence in the administration of the affairs of a bank, and that this includes something more than officiating as figure-heads. They are entitled under the law to commit the banking business, as defined, to their duly-authorized officers, but this does not absolve them from the duty of reasonable supervision, nor ought they be

permitted to be shielded from liability because of want of knowledge of wrong-doing, if that ignorance is the result of gross inattention."

Four justices dissented—Harlan, Gray, Brewer and Brown. In their dissent it is said:

"In fact, those gentlemen, while they were directors, had no knowledge whatever of what was being done by Lee in the conduct of the bank. They took his word that all was right, and gave no attention whatever to the management of its business. Their eyes were as completely closed to what he did, from day to day, in directing the affairs of the bank, as if they had deliberately determined not to see and not to know how he controlled its business."

All of the judges held that reasonable supervision was necessary but differed as to whether that duty had been breached under the facts in that case. In Rose's Notes will be found references to practically all of the cases which rely upon this authority.

Another case equally impressive is that of *Campbell* v. *Watson,* 62 N. J. Eq. 396, 50 Atl. 120, 128. The opinion there was written by Vice-Chancellor Pitney of New Jersey, who was afterwards Mr. Justice Pitney of the Supreme Court. An excellent analysis of that case appears in 4 Fletcher on Corporations, section 2490.

Attention is directed to these conclusions reached by the Vice-Chancellor:

Increasing vigilance under changing conditions is constantly necessary. Directors must use reasonable means to ascertain that public statements are fairly accurate. They must either be qualified to discharge the duties of their office or decline to assume its responsibilities. "If a man feels that he has not had sufficient business experience to qualify him to perform the duties of a director he should either acquire the knowledge by inquiry or refuse to act." They are bound "to acquaint themselves with the extent and mode of supervision exercised by officers of well conducted banking institutions in the neigh-

borhood." They have no right to rely exclusively upon the reports of State Bank Examiners, and must adopt such measures for protection as are in use by greater neighbors in larger towns.

It is further said:

"The man who accepts a bank note in payment of a debt, and the man who makes a deposit in bank, has, each, in my judgment, a right to rely upon the character of the directors and officers of the bank, and that they will perform their sworn duty to manage the affairs of the bank according to law, and devote to its affairs the same diligent attention which ordinary, prudent, diligent men pay to their own affairs; and, I add, such diligence and attention as experience has shown it is proper and necessary that bank directors should give to that business in order to reasonably protect the bank and its creditors against loss."

"It is submitted that the decision represents what may be said to be the growing tendency of the courts to hold directors liable for acts of executive officers, in a proper case, instead of using high sounding and flowery language in announcing the responsible duties and grave liabilities of directors and then exonerating them from liability because they did not actually participate in, or have actual knowledge of, the misdeeds of the executive officer." 4 Fletcher on Corporations, section 2490.

The tendency is to tighten the rule laid down in *Briggs* v. *Spaulding*. The necessity for adequate supervision in recent days has become increasingly evident.

"It is unreasonable to suppose that the question (that decided in *Briggs* v. *Spaulding*) would receive the same answer should it ever be reviewed." 1 Bolles, Modern Law of Banking, p. 293.

What is reasonable care? This is the test laid down by Chief Justice Parker of New York: "The law is settled in this State that directors of monetary corporations are held to the same degree of care that men of ordinary prudence exercise in regard to their own affairs." *Hanna*

v. *Lyon,* 179 N. Y. 107, 71 N. E. 778, 779. See, also, *General Rubber Co.* v. *Benedict,* 215 N. Y. 18, 109 N. E. 96, L. R. A. 1915 F, 617; *Commercial Bank of Bay City* v. *Chatfield,* 121 Mich. 641, 80 N. W. 712; *Horn S. Mining Co.* v. *Ryan,* 42 Minn. 196, 44 N. W. 56; *Wallace* v. *Lincoln Saving Bank,* 89 Tenn. 630, 15 S. W. 448, 24 Am. St. Rep. 625. This is sometimes described as the "New York Rule."

In the well reasoned case of *Swentzel* v. *Penn Bank,* 147 Pa. St. 140, 23 Atl. 405, 15 L. R. A. 305, 30 Am. St. Rep. 718, it is said that it would be impossible for a director in many instances to give to the affairs of a bank that care which a prudent man would give to his own business and that should such a test be enforced it would take all of his time.

The conclusion there reached was that a director should measure up to the standards set by competent directors in other banks. If he does those things which directors of other well managed banks do, he will have done all that can be expected of him but he cannot with safety do less. To the same effect see *Allen* v. *Roydhouse* (D. C.), 232 Fed. 1010.

■ The issue in this case is not whether the defendants conducted themselves as might reasonably be expected of ordinarily prudent men, but whether they conducted the affairs of this bank as might reasonably be expected of ordinarily prudent bank directors.

A railroad in adopting devices in general use by other and well managed railroads is not negligent.

In the application of the standard indicated we are to bear in mind some of the things said by Vice-Chancellor Pitney. Directors must take those precautions which are usually taken in well conducted banks, such as are "in use by its greater neighbors in the larger towns;" "if a man feels that he has not sufficient business experience to qualify him to perform the duties of director he should either acquire the knowledge by inquiry or refuse to act." Moreover they must see that published

statements set out "actual conditions," or must make proper efforts to verify their accuracy.

■ In the instant case we do not think these requirements have been met. Yesterday's standards of vigilance are today inadequate.

Other errors assigned relate to matters adequately and satisfactorily determined by the presiding judge, Hon. A. C. Buchanan. As to them we approve and adopt his written opinion which has been made a part of the record.

They deal with the rights of depositors to sue, with the demurrer, with the charge of multifariousness, with the statute of limitations, with the right to recover dividends paid to stockholders and salaries paid to Bundy and to Tate.

That part of it which bears upon these questions, reads as follows:

■ "It is clearly the law, at least in most jurisdictions, and certainly in Virginia, that no direct action lies to a creditor of a corporation against its directors, who are its agents (except in special instances of which this case is not one), for improper performance or failure in performance of their duties. This is a right belonging to the corporation only, or its legal successors to the right. The creditors must sue, not for any direct right of action in them, but in the right of the corporation, after the corporation, or its proper representatives, have refused to act. The reason is thus given in *Saunders* v. *Bank,* 113 Va. 656, 664, 75 S. E. 94:

" 'If the creditor of a decedent were permitted to exercise the unrestricted right to sue the debtors of the estate, or the stockholders of a corporation, or the creditors of an insolvent corporation, it would lead to infinite confusion. At the same time the stockholder and the creditor have rights which must be protected, and if those upon whom the law has imposed the duty of guarding their rights fail or refuse, after proper request, to take such steps as may be necessary for their protection, or

if conditions exist from which it shall reasonably appear that such a request would have been unavailing, then it is plain, from the authorities which we have considered, that they may themselves bring suit, and thus, as Mr. Pomeroy phrases it, "set in motion the judicial machinery of the court." '

"I think it reasonably clear that this was the theory on which the original bill was drawn. It recites that demand was made upon the receiver to institute a suit against the directors, not, it is true, in *haec verba,* to recover damages, but 'the amounts of their respective losses;' but the bill as a whole shows it is to recover for the losses caused to the bank by the alleged negligence of the directors, and the prayer is for recovery 'of the various amounts of money hereinbefore mentioned as losses to the Peoples Bank of Cleveland and to complainants through the negligence and wrongful conduct of the defendants.'

"It appears that there was no demurrer to the bill, at least no grounds of demurrer, which is the same thing. If there had been a demurrer and the points now argued in defendants' brief had been assigned as grounds, no doubt the bill would have been amended to clarify its purpose. After all the evidence is taken, following as it does the theory of negligence of defendants in the performance of their duties to the bank, it would be inequitable to dispose of the bill as on demurrer, and to say that because of some inapt language in the bill it must be taken as a suit of certain depositors in their own right against the directors. The receiver says in his testimony that demand was made on him to sue and he declined to do so. The receiver should be a party on the theory that any recovery should be administered by him, although, since he is an officer of the court, I see no reason why he could not be required to do so, and any recovery in fact taken in his name, without his being a formal party.

"That the pleadings may conform directly to the evi-

dence, and minor irregularities be corrected, the amendments set out in complainants' motion of December 29th will be allowed.

"It is true it is not shown at what date complainants' deposits were put into the bank, and it is likely that most of the amounts on the books of the bank to their credit when the bank closed were deposited after the alleged acts of negligence. If this were a suit in the direct right of the complainants against the directors, it would seem to be a complete defense to show that the alleged misconduct occurred before the complainants' cause of action arose, and therefore their loss did not proceed from such misconduct. This seems to be the theory of *Landis* v. *Sea Isle City Hotel Co.* (N. J. Ch.) 31 Atl. 755. The court there held that the complainant, who was seeking to hold certain directors of the defendant corporation liable for the value of his stock and also for certain money advanced by him to the corporation which it was unable to repay, could maintain his suit in equity only upon the ground:

" 'First, that these defendants have received moneys belonging to this company which of right should go to its creditors; or, second, that they were his trustees in such a sense that they owe him a duty as a *cestui que trust* which they have failed to perform, or have been guilty of some act of misfeasance as trustees, resulting in his loss, and which was of a character remediable in this court.'

"This suit is prosecuted, not to recover a direct obligation from the defendants to the complainants, but on this theory, stated in the New Jersey case:

" ' * * * * any depositor, by continuing his deposit until the institution is wound up, will be entitled to share ratably with all other depositors in like position in all the assets of the bank, * * *.'

"Damages due to the corporation from the directors for derelictions in their duties are an asset of the corporation. When such asset is realized on, the creditors

of the corporation, including in this instance the depositors, are entitled to share therein. In a proper case it is a duty of the corporation, or its receiver or other successor in title, to sue and recover this asset. On refusal to do so, it becomes the right of the creditors to institute the proceedings, 'to set in motion the judicial machinery of the court.' On this theory I cannot see that it makes any difference whether they were depositors when the alleged defaults occurred. In any event, they are creditors now, asking the benefit of an alleged asset of their debtor.

"The contention that the bill is multifarious because the directors sued held office at different times, is answered by the case of *Saunders* v. *Bank, supra.* It was there pointed out that 'the method pursued was convenient and suitable, that no injury was thereby done to any one, and that the bill was not on that account multifarious; and further, quoting from *Ackerman* v. *Halsey,* 37 N. J. Eq. 356:

" 'That some of the defendants have been directors longer than others is no ground of demurrer, because the court can discriminate between them, and hold those elected recently only liable for losses incurred during their term of office.'

"I think the statute of limitation applicable to the cause of action is five years (Code, section 5818). It was so held in *Winston* v. *Gordon,* 115 Va. 899, 80 S. E. 756. But it is urged in defendants' brief that there has been a change of statute since that decision, that change being that section 1105e (35) of the Code of 1904, then in force, provided that the two year limitation was on 'any liability imposed by the provisions of this act,' while the present limitation provided by section 3816 applies to 'any liability imposed by the laws of this State.' It is argued that this change signifies an intention to make the two year limitation applicable to all acts of directors as such.

"I do not believe the change has that significance. I

doubt that it represents anything more than a change in phraseology to meet the situation caused by inserting the provision as a part of the Code enactment, and causing it to lose its identity as an act. This was originally a part of the large body of corporation law appearing as one act in the Acts of 1902-3-4, Extra Session (chapter 270). If there had been a purpose to change the law as stated in *Winston* v. *Gordon,* it is likely the revisers would have noted the change and stated the purpose. Section 1105e (35) is not referred to in *Winston* v. *Gordon.* I think section 3816 still refers to the positive duties required of directors by the statute law.

\*     \*     \*     \*     \*     \*     \*     \*     \*

"1. The evidence does not support a right to recover for the salaries paid to T. L. Bundy, as president, and to Tate.

"Bundy's salary was voted to him by the stockholders. It was increased by them in 1925 from $300 to $500. It is to be presumed that the stockholders were familiar with the work he did, and it is to be presumed also that they would not have voted the increase unless they thought he was entitled to it. The record does not show that he was not.

"2. A rather singular situation exists in the evidence in regard to the work done by Tate. From Tate's testimony it would appear that he did very little. From Jessee's testimony it would seem there was very little he didn't do. Tate was testifying with the perhaps pardonable impulse of excusing himself for discovering so little while so much was going on. Jessee was evidently stressing the opportunities given to Tate to discover things if he had had the ability. It is quite true that Tate failed to stop Jessee's operations, but his salary was not conditioned upon his success, and there is not enough evidence in addition to proof of his failure to justify requiring him to pay back what was paid him.

"1. With respect to the claim for recovery of $1,600 paid out as dividends for the years 1925 and 1926,

the evidence shows there were sufficient earnings then on hand to cover these dividends and there is no warrant for granting a recovery for this item on the ground that there was worthless paper in the bank that should have been charged against these earnings."

Cross-assignments of error deal with matters covered by Judge Buchanan's opinion and, as we have already said, adequately covered by it.

During the progress of this suit to the end that a full disclosure might be had it was deemed necessary to examine the files of the State Bank Examiner and particularly his reports and recommendations. That examination was denied except under conditions which it was impossible to meet.

It is true that our statute provides, Code, section 4149 (54), that: "All records, reports and information concerning any bank other than those required by law to be public, shall be open only to such officers and employees of the State as may have occasion and authority to inspect them in the performance of their duties, and to any officer or duly authorized agent of such bank, and the imparting of such information by any employee or officer of the State may be sufficient cause for his removal from the position he occupies under the State government."

This, for manifest reasons, is a proper provision, but it was not intended that it should prevent an examination in a pending suit where the trial court was of opinion that it was desirable. Of course, it should be made under proper safeguards and restrictions, but the limitations on such an examination should always be reasonable.

It will be necessary to refer this cause to a master that he may ascertain and report just what is the liability of these defendants, and it is remanded for such other and further action in harmony with the views here expressed as may be necessary.

*Affirmed in part; reversed in part.*