**WHITE et al. v. FEDERAL DEPOSIT INS. CORPORATION.**

No. 4802.

United States Circuit Court of Appeals,
Fourth Circuit.

Sept. 10, 1941.

772

J. Brooks Mapp, of Keller, Va., and Benjamin T. Gunter, Jr., of Accomac, Va. (H. Ames Drummond and George Walter Mapp, Jr., both of Accomac, Va., on the brief), for appellants.

Tazewell Taylor, of Norfolk, Va. (Jeff F. Walter, of Onley, Va., on the brief), for appellee.

Before PARKER and DOBIE, Circuit Judges, and H. H. WATKINS, District Judge.

PARKER, Circuit Judge.

This is an appeal in an action by the Federal Deposit Insurance Corporation, Receiver of the Parksley National Bank, of Parksley, Virginia, against certain of the directors of that bank, to recover assets of the bank transferred to them and to recover a money judgment for moneys of the bank alleged to have been received by them, in large part as collections made on these assets. A jury trial was had in the course of which the trial judge excluded parol evidence of an agreement between the defendants and certain officers of the Federal Reserve Bank of Richmond to the effect that the assets in question were to be transferred to defendants in consideration of a contribution of $50,000 made by them to the bank's assets. Verdict in favor of

the plaintiff was directed by the judge, who retained for further consideration the questions raised by pleas of laches and the statutes of limitations. Upon decision of these questions in favor of the plaintiff, judgment was entered in its favor for the recovery of the assets and for the full amount of the collections thereon made by the defendants plus the sum of $1,009.33 realized from a sale of securities belonging to the bank. From this judgment the directors have appealed. Three questions are raised by the appeal: (1) Whether there was error in excluding the parol evidence of the agreement that the assets in question were to be transferred to defendants; (2) whether there was error in denying to defendants the benefit of the statute of limitations with respect to the assets transferred to them and the collections made thereon; and (3) whether the statute of limitations applies to the $1,009.33 item realized from the sale of bonds belonging to the bank.

The facts are that the bank was placed in the hands of a conservator following the bank holiday of 1933. On May 27, 1933, a plan for reopening it was devised and was communicated to the Comptroller of the Currency. This plan proposed that there should be $50,000 "unconditional voluntary cash contribution by shareholders to surplus fund" and that items aggregating $108,945 should be eliminated from the balance sheet. This plan was approved on June 2nd by the Deputy Comptroller, with two minor modifications suggested by the Federal Reserve Bank of Richmond which are not here material. On July 15th, the conservator of the bank, who was also its cashier and one of its directors, filed a statement with the Comptroller setting forth that the plan had been complied with, and specifically that the sum of $50,000 had been "voluntarily contributed by the shareholders of the bank for the rehabilitation of the capital structure" and that the eliminations required would be made upon the return of the bank to its officers and directors. Thereupon the Comptroller, on July 17th, entered an order terminating the conservatorship and authorizing that the control of the bank be returned to its directors on the morning of July 19th. On the last named date, the directors adopted a resolution reciting the entry of the order by the Comptroller and acknowledging the receipt of all of the assets of the bank from the conservator. Subsequently, in reports made to the Comptroller of the Currency,

the $50,000 addition to capital was consistently referred to as a voluntary contribution.

Evidence was offered, but excluded, that there was an arrangement between the directors of the bank and certain officers of the Federal Reserve Bank of Richmond to the effect that the items charged off and eliminated from the balance sheet should be transferred to the directors who made the cash contribution of $50,000. There was evidence also that all of the stockholders of the bank, as well as all of its directors, knew of this arrangement and approved it. There is nothing in the plan approved by the Comptroller, however, which refers directly or indirectly to any such arrangement; and there is nothing in the records of the bank made at the time to show its existence. In November 1934 an entry was made in the minutes of a meeting of the directors showing the purchase by them of the charged off assets.

The assets charged off and eliminated from the balance sheet included notes and other securities of a face value of approximately $62,000 and an unpaid draft on another bank in the sum of $7,566.92. These were charged off at the time of the reopening of the bank on July 19th; and the papers themselves were separated from the other assets of the bank by the defendant White, who kept them in an envelope to themselves and held them under claim of right for the benefit of himself and the other directors. Collections were made on these charged off assets from time to time aggregating a little in excess of $12,000, were deposited by White in a special account which he maintained in his own name as trustee and were immediately disbursed for the individual benefit of the directors, who claimed to be the rightful owners thereof.

The evidence shows without contradiction that all of the stockholders of the bank knew from the beginning that the defendants were claiming to be the owners of these charged off assets, that there were fifteen stockholders of the bank other than the interested directors and that they owned 14 per cent of the bank's stock. There is evidence, also, that the fact that the directors were claiming these assets was well known from the beginning to the bank examiners who examined the bank for the Comptroller of the Currency and for the Federal Deposit Insurance Corporation, that a representative of the Reconstruction Finance Corporation referred to it in a letter in 1934 and that the Deputy Comptroller of the Currency referred to it in a letter in 1936. Suit was not instituted to recover the assets or to challenge the right of the defendants in same, however, until January 11, 1940.

With respect to the $1,009.33 item, this represented a sum realized over and above the secured indebtedness, from the sale of securities of the bank theretofore pledged to secure a loan, the amount of which had been reported to the Comptroller upon the reopening of the bank as sale price of the pledged securities. When the securities were sold, the amount realized in excess of the loan was credited to the special account of White along with collections upon the charged off assets. There is no evidence that the independent stockholders of the bank or the bank examiners ever discovered how this matter was handled until after the receivership of the bank in 1939.

█ Except in so far as the evidence of the agreement or understanding that the directors were to have the charged off assets tended to support the contention that they were holding these assets adversely to the bank and were protected by the statute of limitations, we agree that this evidence was properly excluded. For the purpose of showing that the assets passed to them upon the opening of the bank, it was clearly not competent because contradictory of the written record made at the time as to the conditions upon which the opening was authorized. The action of the Comptroller in permitting the bank to be opened was based upon 12 U.S.C.A. § 205, which provides: "If the Comptroller of the Currency becomes satisfied that it may safely be done and that it would be in the public interest, he may, in his discretion, terminate the conservatorship and permit such bank to resume the transaction of its business subject to such terms, conditions, restrictions and limitations as he may prescribe."

█ It would seem to be too clear for argument that where the Comptroller, acting pursuant to this statutory authority, grants a permit for the opening of a closed bank upon terms which are made of record at the time, it is not permissible to contradict such record by parol evidence of a different agreement or understanding had with the officers of another institution alleged to represent the Comptroller. No authority is cited to the contrary and we know of none. It is hardly thinkable that the

records of a public officer dealing with matters of the gravest consequence should be thus subjected to contradiction by parol evidence of agreements and understandings. Merely to state the proposition is to answer it.

■ It is argued that the understanding or agreement with the Federal Reserve Bank was subsequent to the offering of the plan of May 27th; but it was admittedly not subsequent to the entry of the Comptroller's order, which, as stated above, was filed on July 17th. Furthermore, there is nothing to indicate that the Federal Reserve Bank had any authority to modify in any way the terms upon which the reopening was to be authorized. It is true that there is testimony that the consent of the Federal Reserve Bank was to be obtained to the terms of reopening; but this was because that bank would be required to furnish the funds which would make the reopening possible, and the testimony furnishes no evidence of authority on its part to modify the terms of the proposed plan for reopening finally approved by the Comptroller. The Comptroller, and not the Federal Reserve Bank, was authorized by Congress to grant the permit for reopening and prescribe the conditions thereof; and the Comptroller could not delegate, even to the Federal Reserve Bank, the authority thus vested in him.

■ It is argued, also, that there is sufficient ambiguity in the plan and order to authorize the introduction of the agreement and understanding with the Federal Reserve Bank by way of explanation; but there is no such ambiguity. "Unconditional cash contribution by shareholders" are words that are clear in their meaning. And there was nothing in the provision for elimination of certain items from the balance sheet which would justify the conclusion that these items were to be turned over to shareholders in return for their "unconditional cash contribution".

■■ On the second question, we think that the judge erred in denying to defendants the benefit of the defenses of laches and of the statute of limitations. It is settled in Virginia, in accordance with the general rule, that directors are not trustees of an express trust and may invoke the defense of the statute. Winston v. Gordon, 115 Va. 899, 80 S.E. 756; Williams v. Fidelity Loan & Savings Co., 142 Va. 43, 128 S.E. 615, at page 624, 45 A.L.R. 664; Anderson v. Bundy, 161 Va. 1, 171 S.E. 501;

Curtis v. Connly, 257 U.S. 260, 42 S.Ct. 100, 66 L.Ed. 222; Cooper v. Hill, 8 Cir., 94 F. 582; Hughes v. Reed, 10 Cir., 46 F.2d 435; Farmer v. Standeven, 10 Cir., 93 F.2d 959; Fletcher Cyclopedia of Corporations, vol. 4 sec. 2697. The rule applicable was well stated by the late Judge Walter H. Sanborn in Cooper v. Hill, supra, in a passage quoted with approval by the Supreme Court of Appeals of Virginia in Winston v. Gordon, supra [115 Va. 899, 80 S.E. 762], as follows: "The directors of a national bank are not trustees of an express trust, with respect to the property or funds of the bank, but of an implied or resulting trust created by the operation of the law upon their official relation to the bank; and the statute of limitations and the doctrine of laches may be invoked in their defense, when sued for a breach of such trust. Such an action is maintainable either at law or in equity, and a court of equity will follow the statute of limitations, unless unusual or extraordinary circumstances render its application inequitable in a particular case."

■ Whether the suit should be treated as one at law to recover the assets transferred with judgment for the amounts collected thereon, or in equity to establish a constructive trust, it is not necessary to decide, as the same period of limitations would apply in either case. Harshberger's Adm'r v. Alger, 31 Grat. 52, 72 Va. 52, 67; DeBaun's Ex'x v. DeBaun, 119 Va. 85, 90, 89 S.E. 239; Fretwell v. Gillette Safety Razor Co., 4 Cir., 106 F.2d 728, 730; Kelley v. Boettcher, 8 Cir., 85 F. 55, 62. It is well settled in Virginia that the statute runs against the establishment of constructive trusts. Johnson v. Black, 103 Va. 477, 49 S.E. 633, 68 L.R.A. 264, 106 Am.St.Rep. 890; Redford v. Clarke, 100 Va. 115, 40 S. E. 630. And this is in accord with the general rule. Speidel v. Henrici, 120 U.S. 377, 7 S.Ct. 610, 30 L.Ed. 718; 34 Am.Jur. 88. The statute here applicable, whether the suit be treated as one to recover assets wrongfully converted by the directors or as one to establish and enforce a constructive trust, is clearly the general or five year provision. Code of 1936, sec. 5818; Anderson v. Bundy, 161 Va. 1, 171 S.E. 501.

■ And we do not think that the running of the statute was stayed by the provision of section 5811 of the Code that "the right to recover money paid under fraud or mistake shall be deemed to accrue, both at law and in equity, at the time such fraud

or mistake is discovered, or by the exercise of due diligence ought to have been discovered." Assuming, without deciding, that the diversion of assets constituted fraud in law or mistake within the meaning of this section (cf. Johnson v. Black, supra, 103 Va. 477; 49 S.E. at page 637), it is clear that same was discovered more than five years prior to the institution of suit. Of course, notice to the directors who were responsible for the diversion could not be held discovery by or notice to the corporation; but there was more than this. There was actual knowledge on the part of all the stockholders, including fifteen independent stockholders owning fourteen per cent of the stock; and there was actual knowledge, also, on the part of the bank examiners representing the Comptroller of the Currency and the Federal Deposit Insurance Corporation. There was no fraudulent concealment or other exceptional circumstance to prevent the running of the statute; but the assets were openly taken under claim of right and pursuant to an agreement which, while it could not affect the rights of the bank as fixed by the order of the Comptroller of the Currency, was thoroughly understood, not only by the other stockholders, but also by those whose duty it was to protect the interest of depositors and other creditors, including the examiners for the Federal Deposit Insurance Corporation, which, as a guarantor of the Bank's deposits, was most vitally concerned in the preservation of its assets.

■ Notice to all of the stockholders of a matter so intimately affecting their rights must be deemed notice to the corporation. Simmons Creek Coal Co. v. Doran, 142 U.S. 417, 436, 12 S.Ct. 239, 35 L.Ed. 1063; Mercantile National Bank v. Parsons, 54 Minn. 56, 55 N.W. 825, 40 Am.St. Rep. 299; Dawson Farmers Elevator Co. v. Opp, 57 N.D. 598, 223 N.W. 350; 13 Am.Jur. 471 note 16; 19 C.J.S., Corporations, § 1079, page 617. What we have here, however, is more than mere notice to the corporation. We have actual knowledge on the part of all the stockholders of the corporation who would be entitled to complain of the wrong, coupled with actual knowledge on the part of bank examiners whose duty it is to protect depositors and the public. Under such circumstances, we think that there is no escaping the conclusion that, within the meaning of the quoted provision of section 5811 of the Code, the fraud or mistake involved in the transfer of the assets was "discovered, or by the exercise of due diligence ought to have been discovered" so as to set the statute of limitations running.

In reaching this conclusion we have not taken account of the rather significant facts that the transfer of assets was shown by the minutes of a directors' meeting as early as 1934, that a representative of the Reconstruction Finance Corporation referred to it in a letter in 1934, that the Comptroller of the Currency complained of it in a letter in 1936, and that two independent members were elected to the Board of Directors, one of whom was chosen president, some time prior to the bank's failure. These facts, while significant, are not determinative. The entry in the minutes of the directors may not have been seen by any persons other than the directors, the Reconstruction Finance Corporation was only one of the creditors, and the letter from the Comptroller of the Currency and the election of the independent directors occurred within the five year period preceding suit.

■ It is argued that the statute did not run in favor of the directors because, it is said, they controlled the corporation through a majority of stock ownership and control of the directorate and there was consequently no one to sue them. It is clear, however, that suit in behalf of the corporation could have been brought by any of the independent stockholders. Curtis v. Connly, 257 U.S. 260, 42 S.Ct. 100 66 L.Ed. 222; Hughes v. Reed, 10 Cir., 46 F.2d 435; McNair v. Burt, 5 Cir., 68 F.2d 814, 815; Anderson v. Gailey, D.C., 33 F. 2d 589, 592; Mobley v. Faircloth, 174 Ga. 808, 164 S.E. 195, 83 A.L.R. 1201 and note. In addition to this, there was ample power on the part of the public authorities who had knowledge of the situation to take action with respect thereto. The national bank examiners reported to the Comptroller of the Currency, who had "ample power to compel restitution, resignation, or a receivership". Hughes v. Reed, supra [46 F. 2d 442]; and the Federal Deposit Insurance Corporation was given ample power to protect itself and the public. 12 U.S.C. A. § 264.

We do not hold that knowledge of a single stockholder or of a bank examiner would be imputed to the bank, nor that the right of such stockholder or the banking authorities to seek a remedy would, of itself, set the statute of limitations running. What we do hold is that knowledge of all

776

the stockholders is knowledge of the bank and that where these and the banking authorities have such knowledge and have power under the law to institute suit or take other action to remedy the situation, the statute of limitations is set in motion. In other words, there is not reason why the running of the statute with respect to a diversion of assets should be suspended when all parties affected thereby have knowledge thereof and full power under the law to pursue a remedy.

■ We do not think that the reports to the Comptroller, to the effect that the $50,000 contributed to the capital fund of the bank was a "voluntary contribution", was sufficient to show that the claim of the directors to the charged off assets was not adverse or to deny them the benefit of the statute. The evidence shows beyond question that they were claiming the assets adversely, to the knowledge of the independent stockholders and the bank examiners, and it is clear that they did not fully appreciate the meaning of "voluntary contribution". Nothing is shown to have been said by them with respect to the charged off assets inconsistent with their adverse claim thereto.

■ It is argued that the statute of limitations does not protect the directors because they profited personally from the diversion of assets. We think there is no basis for such a distinction. It is true, of course, that the personal interest of a director adverse to that of the corporation will prevent notice to him being deemed notice to the corporation; but, as indicated above, notice to the corporation here is not dependent upon notice to the interested directors, but is based upon notice to all the stockholders, including those who did not profit by the diversion. We know of no authority supporting the proposition that, in such case, the directors are to be denied the benefit of the statute because they profited by the diversion. The case of Anderson v. Gailey, D.C., 33 F.2d 589, relied on by plaintiff, does not so hold. There the case was retained as to transactions between the directors and the bank so that these might be more closely inquired into, presumably for the purpose of determining whether there was such concealment with regard thereto as would prevent the running of the statute. On the other hand, the statute has

been expressly held to apply in cases where the directors benefited from the diversion. Cooper v. Hill, supra; Farmer v. Standeven, supra. . And this holding necessarily follows from the holding that directors are not trustees of an express trust. The property passing into their hands by such diversion is not property as to which they sustain a trust relationship, which would prevent the running of the statute; and there is no basis for holding that the statute does not run with respect to the wrong done the corporation. It is true, of course, that the receipt by them of assets of the bank would give rise to a constructive trust; but, as above pointed out, it is well settled in Virginia that the statute of limitations runs against the establishment of constructive trusts.

■ On the third question, the item of $1,009.33 was not a collection from assets which had been transferred to defendants with the knowledge of the other stockholders of the bank. It was derived from a sale of assets in which they neither had nor claimed any interest whatever. It was credited on the books just as though it were a collection made on the assets which had been transferred to the directors; and no one examining the books would have been apprised by the entry that this was not the case. While we do not intimate that there was any conscious intent on the part of defendants to defraud with respect to this transaction, there can be no question but that such appropriation of the bank's assets to the use of its managing officers and directors constituted fraud in law or at least mistake on their part. Johnson v. Black, supra, 103 Va. 477, 49 S.E. at page 637. And since there is nothing to show that the independent stockholders, or the bank examiners, had notice or knowledge thereof, and since the only entry on the books with regard thereto was of such nature that it cannot be said that they ought to have discovered the fraud or mistake in connection therewith, we think that the statute of limitations was not set in motion with regard to it.

The judgment of the court below will accordingly be reversed and the cause will be remanded for further proceedings not inconsistent herewith.

Reversed.