DEPARTMENT OF BANKING OF THE STATE OF NEBRASKA, AS RECEIVER AND LIQUIDATING AGENT OF NEBRASKA STATE BANK OF VALENTINE, VALENTINE, NEBRASKA, INSOLVENT, APPELLEE AND CROSS-APPELLANT, V. FRANK L. COLBURN, APPELLANT AND CROSS-APPELLEE.

198 N. W. 2d 69

Filed May 26, 1972. No. 38116.

Michael V. Smith and W. Gerald O'Kief, for appellant.

Milton C. Murphy of Murphy, Pederson & Piccolo, and Bernard C. Smith of Smith Brothers, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, and CLINTON, JJ.

BOSLAUGH, J.

The Nebraska State Bank of Valentine, Nebraska, was closed on October 29, 1964, by the Department of Banking of the State of Nebraska. The bank had become insolvent because its president, Richard L. Davenport,

had embezzled over $3,000,000 of its funds.

The defendant, Frank L. Colburn, was a director and the cashier of the bank at the time it was closed. This action was commenced on June 8, 1966, by the Department of Banking, as receiver and liquidating agent, to recover from Colburn the loss sustained by the bank because of his failure to discover and detect the misappropriation of bank funds by Davenport. Essentially, the action was one to recover damages caused by the negligence of the defendant.

The jury returned a verdict for the defendant. The trial court sustained a motion for judgment notwithstanding the verdict and ordered a new trial on the issue of damages only. The trial court determined, as a matter of law, the defendant was liable for the loss caused by his negligence between June 8, 1962, and October 29, 1964, but that the amount of the loss was a question for the jury. The defendant has appealed. By cross-appeal the plaintiff contends that the trial court should have determined the damages as a matter of law.

The defendant was first employed by the bank in 1924 as a teller and posting machine operator. The bank was then controlled by E. C. Davenport and J. W. Tobien. In 1930, the defendant became the cashier of the bank. In 1948, Richard L. Davenport succeeded his father, E. C. Davenport, as president of the bank. After the death of E. C. Davenport, the control of the bank passed to Richard L. Davenport and his mother, M. M. Davenport. At the time the bank closed they, together with Davenport's wife, owned approximately 55 percent of the stock.

Richard L. Davenport testified, by deposition, that sometime after 1948 he commenced the misappropriation of bank funds. By 1950 or 1951 the bank had become insolvent. His method of operation involved the use of notes and property statements that had been signed in blank by customers of the bank. He would

fill out the notes and property statements and then insert the notes into the flow of daily transactions of the bank or send them directly to a correspondent bank. An account might be opened to receive the proceeds from the spurious note. The proceeds from the notes would be transferred by use of debit memorandums. When monthly statements were made he would hold the statements or have them remade so that the accounts would appear to have proper balances.

The embezzlement was difficult to discover because the transactions appeared to be regular on their face. The signatures were genuine and the property statements seemed to justify the loans. The bank did a large volume of business and occasionally had a million-dollar day. On a typical day there would be 3,000 or more bookkeeping entries of which only 4 or 5 might relate to spurious transactions. Notes that were placed directly with correspondent banks would appear only in the total remittances for the day. The matter was further complicated in that some of the notes were valid in part.

Colburn had his desk near the front door of the bank and devoted a large part of his time to an insurance business that he had operated since 1930 and as a partnership with Davenport. His other duties included supervision of the bookkeeping department and the cash in the bank. The loans were handled by Davenport although Colburn occasionally handled small transactions. Davenport opened all the mail and kept many of the records in his office in a locked file.

Although Colburn had been the cashier of the bank for nearly 35 years, he was not familiar with statutes or directives of the Department of Banking concerning the duties of the officers of a bank. His understanding was based upon his experience in the bank and his association with the Davenports. He had complete confidence in Richard L. Davenport, as did the other officers, employees, and customers of the bank.

The bank was examined regularly by the Department of Banking and the Federal Deposit Insurance Corporation. None of these examinations indicated any irregularity other than a very high volume of loans, both in-bank loans and loans placed or sold to correspondent banks. This condition also caused concern to the defendant. On May 19, 1964, the defendant called the Deputy Director of Banking and said he was concerned about the note case of the bank; the volume of loans; the size of some of the loans; and the territory in which the loans were being made. The defendant requested a special examination of the bank.

A joint examination conducted by the Department of Banking and the FDIC commenced on October 13, 1964. During this examination the examiners were instructed to check the proceeds from notes and verify a part of the accounts. The examination failed to disclose any irregularity and on October 22, 1964, the examiners were ready to leave the bank.

During the second week of the examination the defendant happened to see some of the working papers used by the examiners and noticed that all or most of the correspondent banks appeared to hold notes with the Tobien name on them. The defendant obtained copies of the working papers from the examiners and made an analysis of the loans listed on them.

The next day, or the day after that, the defendant happened to have a conversation with Paul Charbonneau, a customer who was supposedly indebted to the bank in the amount of $90,000. During their conversation the defendant learned that Charbonneau had no cattle and that the cattle on his land belonged to another man. The defendant then asked the examiners to check the Charbonneau and J. W. Tobien notes.

As the examiners were leaving the bank on October 22, 1964, they talked with the defendant and advised him concerning two large notes and five small notes that were to be reduced or charged off. They also ad-

vised the defendant that they had checked the Charbonneau and Tobien lines and that they were "O.K." The defendant asked the examiners to check some of the other notes which he thought were too high or were signed by debtors that he did not know. During the conversation, the defendant called J. W. Tobien and made an appointment for the examiners to see Tobien that evening.

That evening the Tobiens told the examiners they were not indebted to the bank. On the following day the Director of Banking, his counsel, and the examiners confronted Davenport with this information. The Tobiens were called into the bank and they each admitted they were indebted on the notes in question.

The following week the examiners returned to the bank and did more checking with respect to proceeds from notes. They uncovered what appeared to be a serious irregularity in the St. Francis Educational Society account. Although the society had suffered no loss, it was apparent there had been irregularities in the transactions. After interviewing other debtors they eventually obtained a statement from L. C. Beel, Sr., that he was not indebted to the bank. The Department of Banking then closed the bank.

The plaintiff's right to recover in this case depended upon proof of negligence. The burden of proof was upon the plaintiff to show that the defendant had been negligent in failing to detect or discover the misappropriation of bank funds by Davenport and that the negligence of the defendant was the proximate cause of the loss. There was no evidence to sustain the allegations that the defendant had participated in the embezzlement and misappropriation of bank funds by Davenport.

A director of a bank must exercise ordinary care and prudence in the administration of the affairs of the bank. He must exercise that degree of care which ordinarily prudent and diligent men would exercise un-

der similar circumstances. Briggs v. Spaulding, 141 U. S. 132, 11 S. Ct. 924, 35 L. Ed. 662. He is required to give the same degree of care and prudence as is generally exercised by men in their own affairs. Ashby v. Peters, 128 Neb. 338, 258 N. W. 639, 99 A. L. R. 843. See, also, Annotation, 25 A. L. R. 3d 941.

In determining whether a motion for judgment notwithstanding the verdict should have been sustained, the evidence must be considered in the light most favorable to the party who obtained the verdict. Haffke v. Grinnell, *ante* p. 323, 196 N. W. 2d 390. Every controverted fact must be resolved in his favor and he is entitled to the benefit of every reasonable inference that may be drawn therefrom. The verdict of a jury based upon conflicting evidence will not be set aside unless it is clearly wrong.

Much of the evidence bearing upon the issue of negligence was circumstantial. The direct evidence was largely in conflict. The issue of liability was a question of fact which, ordinarily, is a question for the jury.

The trial court correctly determined that the action was one at law. There was no serious controversy concerning the loss sustained by the bank. The principal issues were negligence and proximate cause.

In addition to the evidence which has been summarized, the following matters were of significance in this case. The defendant owned only about 4 percent of the stock. The Deputy Director of Banking testified that Davenport dominated the affairs of the bank and that Colburn "was never in a position to get anything done." He characterized the defendant as "not much more than a figurehead cashier."

Gerner v. Mosher, 58 Neb. 135, 78 N. W. 384, cited by the plaintiff, was an action in deceit based upon the publication of false statements as to the financial condition of a bank. In that case the falsity of the statements could have been discovered easily by a comparison of each report with the daily balance sheet of the

bank for the same date. In this case the evidence shows that the discovery of the embezzlement was a very difficult matter.

Robert C. O'Dell, a certified public accountant employed by Haskins & Sells, testified that he and his assistants spent more than 30 weeks making an audit of the bank for the Department of Banking to determine which loan accounts were overstated. He explained in detail how it was necessary to work from the tape of the proof machine which contained entries for all of the transactions of the bank on a particular day. He stated that it would be a "Herculean task" to trace particular loans through from origination because of the methods used by Davenport.

Lane Nansel, a senior examiner for the Department of Banking who participated in the October 13, 1964, examination, testified that during the third week of the examination, when the examiners were tracing the proceeds of notes, it "entailed quite a number of hours of labor." An entire day was spent checking the St. Francis Educational Society account.

The Deputy Director of Banking testified that an audit by independent certified public accountants would not have disclosed the embezzlement. Only a verification of each note and deposit account would have disclosed the embezzlement.

At no time did the Department of Banking suspect that there had been an illegal diversion of funds. The department thought Davenport was a poor loan man and that his loan policy would eventually destroy the bank. This is the same matter that concerned the defendant and caused him to call the Deputy Director of Banking on May 19, 1964.

On October 22, 1964, the joint examination had been completed and the examiners were ready to leave the bank. Although this examination had included a verification of from 15 to 20 percent of the accounts and an investigation of the disposition of proceeds from

notes, no irregularities had been discovered. It was only at the urging of the defendant that further examination and investigation was made which eventually disclosed the embezzlement.

As we view the record, a reasonable trier of fact could find that the plaintiff had failed to prove that the loss was caused by negligence of the defendant in failing to detect and discover the embezzlement by Richard L. Davenport.

It is unnecessary to consider further the issues raised by the cross-appeal.

The judgment of the district court is reversed and the cause remanded with directions to reinstate the verdict and dismiss the action.

REVERSED AND REMANDED WITH DIRECTIONS.

CLINTON, J., dissenting.

I respectfully dissent. The record I believe discloses that the defendant Colburn, as a director of the bank, exercised not the slightest degree of care to prevent or detect defalcations such as here occurred. The record shows that from the time he first became a director he abdicated completely his responsibilities as such and left the entire, complete, and absolute control of the bank in the hands of the bank manager. He did not in all those years even suggest a director's audit with independent random verification of accounts and loans. He did not suggest any of the internal controls which might prevent, discourage, or lead to the detection of defalcations. A bank directorship is not an honorary position. Depositors and stockholders rely upon the directors to fulfill their obligations. Directors who do not wish to exercise their responsibilities should resign if they wish to avoid responsibility for their defaults. Colburn was negligent as a matter of law because he did not exercise even slight care. Gibbons v. Anderson, 80 F. 345; Gamble v. Brown, 29 F. 2d 366, cert. den. 279 U. S. 839, 49 S. Ct. 253, 73 L. Ed. 986; Bank of Commerce v. Goolsby, 129 Ark. 416, 196 S. W. 803; 25

A. L. R. 3d, Directors—Liability for Defalcations, § 18, p. 1011; Atherton v. Anderson, 99 F. 2d 883; Anderson v. Bundy, 161 Va. 1, 171 S. E. 501; Lippitt v. Ashley, 89 Conn. 451, 94 A. 995.

I do not suggest of course that one director alone can take appropriate precautions without the joinder of the majority of the directors. Proksch v. Bettendorf, 218 Iowa 1376, 257 N. W. 383. In this case the record shows that all of the directors abdicated their responsibilities. Under these circumstances whether the defendant could have done anything effective to prevent or to earlier detect the defalcations is open to debate. Therefore, whether the defendant's negligence was the proximate cause of the bank's losses presented a jury question. The trial court properly set aside the verdict and on retrial only the questions of proximate cause and the amount of damages, if any, would be jury questions.